No. 19-70021

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

BRANDON BERNARD,

Defendant-Appellant.

On appeal from the United States District Court
for the Western District of Texas at Waco
Crim. No. 6:99-CR-70-2, Civ. No. 6:04-CV-164

The Honorable Alan D. Albright,
United States District Judge

**DEFENDANT-APPELLANT'S OPENING BRIEF**

Robert C. Owen
Law Office of Robert C. Owen, LLC
53 West Jackson Blvd., Suite 1056
Chicago, IL 60604
Phone: (512) 577-8329
Email: robowenlaw@gmail.com
Texas Bar No.: 15371950

John R. Carpenter
Asst. Federal Public Defender
1331 Broadway, Suite 400
Tacoma, Washington 98402
Phone: (253) 593-6710
Email: john_carpenter@fd.org
Washington Bar No.: 23301

Attorneys for Defendant-Appellant
Brandon Bernard

# CERTIFICATE OF INTERESTED PARTIES

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

[None].

Counsel for the opposing party in this appeal is the Office of the United States Attorney for the Western District of Texas[1].

*s/ Robert C. Owen*
Robert C. Owen
Counsel of Record

*s/ John R. Carpenter*
John R. Carpenter

Attorneys for Defendant-Appellant
Brandon Bernard

---

[1] Because the Government did not file any documents in the proceeding below, it is not clear who will appear for the Government in this Court. Elizabeth Berenguer, Esq., and Joseph H. Gay, Jr., Esq., are appearing for the Government in the related case *In re Bernard*, No. 19-50837.

## REQUEST FOR ORAL ARGUMENT

The issues presented bear directly on the integrity of the legal system in the gravest of matters—proceedings related to imposing and reviewing a sentence of death, where the courts have a duty to examine claims of error "with painstaking care[.]" *See Kyles v. Whitley*, 514 U.S. 419, 422 (1995) (citation omitted). The unrebutted allegations are that the Government, to secure a death sentence, suppressed expert testimony that was favorable to the defense. Trials should be hard fought, but not won this way. Given the vital interests that hang in the balance—namely, the public's faith in the judicial system and Brandon Bernard's life—the Court should hear argument.

**TABLE OF CONTENTS**

CERTIFICATE OF INTERESTED PARTIES .....................................................i

REQUEST FOR ORAL ARGUMENT ....................................................... ii

TABLE OF CONTENTS.................................................................. iii

I.     JURISDICTION .............................................................1

II.    ISSUES PRESENTED ......................................................1

III.   STATEMENT OF THE CASE ...........................................4

     A.    Introduction .......................................................4

     B.    Relevant procedural history ................................7

     C.    The facts establish that two harmful constitutional violations influenced Bernard's death sentence...................................9

          *1.*    *Introduction: The common factual basis of Bernard's as-yet-unexamined sentencing-phase claims under* Brady *and* Napue. ..................................................9

          *2.*    *In 2018, the long-suppressed expert opinion of former Sgt. Sandra Hunt surfaced for the first time.* ...................................10

          *3.*    *Sgt. Hunt's expert opinion was suppressed by the Government.* ..........................................12

          *4.*    *Sgt. Hunt's expert opinion was both favorable and material under* Brady. .............................13

          *5.*    *The Government affirmatively misled the jury when it falsely suggested, contrary to Sgt. Hunt's findings, that no hierarchy of authority or status existed in the 212 PIRU Bloods.*...................16

6.     *By presenting a false picture of the facts – telling jurors that the 212 PIRU Bloods lacked any hierarchical structure when its own expert had concluded to the contrary – the Government violated* Napue *and its progeny, and the violation was harmful.* ..................17

IV.     SUMMARY OF ARGUMENT.....................................................19

V.     ARGUMENT.................................................................................21

A.     Bernard's motion to the district court should not be deemed a second motion subject to 28 U.S.C. § 2255(h). ...................21

1.     *Allowing Bernard's new* Brady *claim to be heard is "critically important to maintaining the integrity of our judicial system"; any other outcome would unfairly reward the Government for its own constitutional violation.* ..................................................21

2.     Panetti v. Quarterman *establishes that a second-in-time application for collateral relief does not always constitute a "second or successive" motion subject to the strictures of § 2255.*................................................24

3.     *Under* Panetti*, a second-in-time motion for post-conviction relief that alleges a* Brady *claim is not "second or successive" if the Government, by continuing to conceal material evidence, prevented the prisoner from including the claim in his original motion.*................28

a.     *Scott's* analysis of the *Panetti* considerations ...............29

b.     *Scott's* analysis of *Tompkins*............................................33

4.     *No Fifth Circuit decision has analyzed whether a previously unavailable* Brady *claim is successive under* Panetti*; in treating the question as settled in this Court,* Blackman *mistakenly relied on cases that in fact had not addressed the issue.* ..................................................36

5.     *For the same reasons,* Panetti *makes Bernard's* Napue *allegation reviewable.*............................................40

iv

B. Even if Bernard's motion were deemed successive, he is entitled to relief............................................................................40

    1. *Bernard is entitled to relief under Rule 60(b).* .........................40

        a. Bernard's motion meets the requirements for relief under Rule 60(b)..............................................40

        b. Bernard's alternative motion under Rule 60(b) is not a successive habeas motion under *Gonzalez.*...........45

    2. *If Bernard's motion were deemed successive and Rule 60(b) relief were deemed unavailable, then the restrictions in § 2255(h) would violate the Constitution's Suspension Clause as applied to him.*..........................................51

VI. CONCLUSION......................................................................52

CERTIFICATE OF SERVICE ..................................................2

CERTIFICATE OF COMPLIANCE.........................................3

v

# TABLE OF AUTHORITIES

**FEDERAL CASES**

*Ackermann v. United States,*
340 U.S. 193 (1950)................................................................43

*Allen v. Mitchell,*
757 Fed.App'x. 482 (6th Cir. 2018) ................................................. 35

*Ampadu v. U.S. Citizenship & Immigration Servs., Dist. Dir.,*
944 F. Supp. 2d 648 (C.D. Ill. 2013) ................................................. 44

*Blackman v. Davis,*
909 F.3d 772 (5th Cir. 2018) ..............................................*passim*

*Brady v. Maryland,*
373 U.S. 83 (1963) ............................................................... *passim*

*Burton v. Stewart,*
549 U.S. 147 (2007) (per curiam) ................................................. 27

*Castro v. United States,*
540 U.S. 375 (2003) ................................................................. 27

*Curtiss v. Mount Pleasant Corr. Facility,*
338 F.3d 851 (8th Cir. 2003) ................................................. 42

*De La Paz v. Coy,*
786 F.3d 367 (5th Cir. 2015) ................................................. 37, 39

*Douglas v. Workman,*
560 F.3d 1156 (10th Cir. 2009) ................................................. 24

*Felker v. Turpin,*
518 U.S. 651 (1996) ................................................................. 27

*Ford v. Wainwright,*
477 U.S. 399 (1986) ................................................................. *passim*

*Gamboa v. Davis,*
782 Fed.Appx. 297 (5th Cir. 2019) ................................................. 49

*Giglio v. United States,*
405 U.S. 150 (1972) ................................................................. 17

*Gonzalez v. Crosby*,
545 U.S. 524 (2005) ............................................................. 20, 45, 55

*Ho v. Dep't of Homeland Sec.*,
No. SACV12805JLSRNBX , 2014 WL 12572927 (C.D. Cal. Feb. 11, 2014) . 44

*Holmberg v. Ambrecht*,
327 U.S. 392 (1946) ............................................................. 42

*In re Benjamin's-Arnolds, Inc.*,
1997 WL 86463 (Bankr. D. Minn. Feb. 28, 1997) ............................. 41

*In re Bradford*,
660 F.3d 226 (5th Cir. 2011) ................................................. 1

*In re Coleman*,
344 F.App'x 913 (5th Cir. 2009) ............................................. 39

*In re Coleman*,
768 F.3d 367 (5th Cir. 2014) ................................................. 48, 50

*In re Davila*,
888 F.3d 179 (5th Cir. 2018) ................................................. 36, 37, 39

*In re Edwards*,
865 F.3d 197 (5th Cir. 2017) ................................................. 47, 48, 50

*In re Lampton*,
667 F.3d 585 (5th Cir. 2012) ................................................. 26

*In re Pickard*,
681 F.3d 1201 (10th Cir. 2012) .............................................. 47, 49, 50

*In re Webster*,
605 F.3d 256 (5th Cir. 2010) ................................................. 5, 7, 22, 51

*Johnson v. Dretke*,
442 F.3d 901 (5th Cir. 2006) ................................................. 39

*Jung Ai Shin v. U.S. Citizenship & Immigration Servs.*,
No. CV12-2839-GHK SSX, 2013 WL 571781 (C.D. Cal. Feb. 13, 2013) . 43, 44

*Karam v. Corinthian Colleges, Inc.,*
  No. CV106523GHKPJWX, 2015 WL 13593539 (C.D. Cal. Mar. 4, 2015) .... 44

*Kirkpatrick v. Whitley,*
  992 F.2d 491 (5th Cir. 1993) ........................................................................ 40

*Kyles v. Whitley,*
  514 U.S. 419 (1995) ...................................................................................... ii

*Leal Garcia v. Quarterman,*
  573 F.3d 214 (5th Cir. 2009) ............................................................ 37, 38, 39

*Liljeberg v. Health Servs. Acquisition Corp.,*
  486 U.S. 847 (1988) ...................................................................................... 41

*McCleskey v. Zant,*
  499 U.S. 467 (1991) ................................................................................ 27, 31

*Miller v. Alabama,*
  567 U.S. 460 (2012) ...................................................................................... 10

*Miller–El v. Cockrell,*
  537 U.S. 322 (2003) ...................................................................................... 26

*Monk v. Huston,*
  340 F.3d 279 (5th Cir. 2003) .................................................................. 34, 38

*Napue v. Illinois,*
  360 U.S. 264 (1959) ............................................................................. *passim*

*Panetti v. Quarterman,*
  551 U.S. 930 (2007) ............................................................................. *passim*

*Pliler v. Ford,*
  542 U.S. 225 (2004) ...................................................................................... 42

*Rhines v. Weber,*
  544 U.S. 269 (2005) ...................................................................................... 26

*Scott v. United States,*
  890 F.3d 1239 (11th Cir. 2018) ........................................................... *passim*

*Shields v. Norton,*
  289 F.3d 832 (5th Cir. 2002) .................................................................. 34, 38

*Sparks v. United States*,
  No. W-99-CR-070-3, 2018 WL 1415775 (W.D. Tex., March 19, 2018) .. *passim*

*Spitznas v. Boone*,
  464 F.3d 1213 (10th Cir. 2006) ....................................................... 49

*Stewart v. Martinez-Villareal*,
  523 U.S. 637 (1998) ..................................................................... 25

*Strickler v. Greene*,
  527 U.S. 263 (1999) ............................................................... 31, 46

*Texas v. United States*,
  523 U.S. 296 (1998) .............................................................. 34, 38

*Thompson v. Calderon*,
  151 F.3d 918 (9th Cir. 1998) ......................................................... 22

*Tompkins v. Secretary, Department of Corrections*,
  557 F.3d 1257 (11th Cir. 2009) .............................................. *passim*

*Trinh v. United States Citizenship & Immigration Servs.*,
  No. 14-MC-80337-MEJ, 2015 WL 2088766 (N.D. Cal. May 5, 2015) .......... 44

*United States v. Bagley*,
  473 U.S. 667 (1985) ..................................................................... 15

*United States v. Bernard*,
  299 F.3d 467 (5th Cir. 2002) ........................................................... 8

*United States v. Bernard*,
  762 F.3d 467 (5th Cir. 2014) ........................................................... 8

*United States v. Fernandez*,
  797 F.3d 315 (5th Cir. 2015) ......................................................... 43

*United States v. Fulton*,
  780 F.3d 683 (5th Cir. 2015) ........................................................... 5

*United States v. Mitchell*,
  271 U.S. 9 (1926) ....................................................................... 37

*United States v. Patton*,
  750 F. App'x 259 (5th Cir. 2018) .................................................... 21

*United Transp. Union v. Foster*,
  205 F.3d 851 (5th Cir. 2000) ....................................................... 34, 38

*Wooten v. McDonald Transit Assocs., Inc.*,
  788 F.3d 490 (5th Cir. 2015) ................................................. 20, 41, 45

**U.S. CONSTITUTION AND STATUTES**

United States Constitution, Art. I, §9, cl. 2 .......................................*passim*

18 U.S.C. § 1111 ...................................................................................... 7

18 U.S.C. § 1117 ...................................................................................... 7

18 U.S.C. § 2119 ...................................................................................... 7

18 U.S.C. § 3592 ...................................................................................... 6

18 U.S.C. § 3593 .................................................................................... 15

18 U.S.C. § 3594 .................................................................................... 15

28 U.S.C. § 1291 ...................................................................................... 1

28 U.S.C. § 1631 ...................................................................................... 5

28 U.S.C. § 2244 .......................................................................... 6, 20, 21

28 U.S.C. § 2254 ........................................................................ 23, 26, 48

28 U.S.C. § 2255 ............................................................................ *passim*

**RULES**

Fed. R. App. P. 32 .................................................................................. 55

Fed. R. Civ. P. 59 .................................................................................. 41

Fed. R. Civ. P. 60 ............................................................................ *passim*

5th Cir. R. 32 ........................................................................................ 55

**OTHER**

Antiterrorism and Effective Death Penalty Act .................................*passim*

Black's Law Dictionary (10th ed. 2014) .........................................34, 38

11 Charles Alan Wright & Arthur R. Miller,
  *Federal Practice and Procedure,* Civ. §2864 (3d ed.) .....................43

# I.  JURISDICTION

Bernard maintains that the district court had jurisdiction under 28 U.S.C. § 2255 or, alternatively, under Fed. R. Civ. P. 60(b) ("Rule 60(b)"). However, the district court held that it lacked jurisdiction, in an order dated August 8, 2019. ROA.2432. The district court amended its judgment in an order dated September 10, 2019. ROA.2442. Bernard gave timely notice of appeal on November 8, 2019. ROA.2444-45. This Court has jurisdiction under 28 U.S.C. §§ 1291 and 2253. *See In re Bradford,* 660 F.3d 226, 229 (5th Cir. 2011) ("[T]his Court has jurisdiction over appeals from orders that transfer successive motions to this Court.")

# II.  ISSUES PRESENTED

1. Under *Panetti v. Quarterman,* a second-in-time § 2255 motion is not a second or successive motion if it raises issues that could not be pursued at the time of the initial motion; if it would not have been deemed an abuse of the writ under pre-AEDPA law; if deeming it second or successive would not fulfill AEDPA's goals of comity, finality, and federalism; and if deeming it second or successive would have serious negative implications for habeas practice, such as requiring inclusion of unripe allegations in the initial § 2255. This is especially so if a contrary ruling would mean a petitioner "forever losing [his] opportunity for any federal review" of his constitutional claim, due solely to the unconstitutional actions of the Government.

1

A *Brady*[2] claim like Bernard's, which could not reasonably have been discovered because the Government continued to hide the exculpatory material throughout Bernard's initial § 2255 proceeding, fits squarely under *Panetti*'s analysis. Since unknown, it could not be brought until discovered. For that reason, it would not have been deemed abusive under pre-AEDPA law and would not frustrate AEDPA's purposes. Moreover, a contrary ruling would both force prisoners to include unripe claims in their initial § 2255 motions (with serious negative implications for habeas practice) and risk forever denying any opportunity for federal review of those claims.

Given this concordance between the facts of this case and *Panetti*, should Bernard's motion be deemed non-successive?

2. A motion is properly brought under Rule 60(b) where it challenges the integrity of the § 2255 proceeding itself, even if the movant ultimately hopes to re-open those proceedings. This is so even where the flaw in the integrity of the § 2255 proceedings resembles the constitutional violation alleged to have occurred at trial.

Bernard alleges a problem with the integrity of the initial § 2255 proceeding, namely, that the Government represented to the court during that proceeding that it

---

[2] *Brady v. Maryland*, 373 U.S. 83 (1963).

had complied with *Brady* at trial, when it fact it had committed serious *Brady* violations and was continuing to suppress favorable evidence.

Given these facts, did the district court have jurisdiction over Bernard's Rule 60(b) motion?

3. If Bernard (a) could not have his sentencing-phase *Brady* and *Napue* claims reviewed in his initial § 2255 proceeding, because the Government continued to conceal the necessary *Brady* material; (2) cannot have them reviewed via a subsequent § 2255 motion, on the theory that it is second or successive notwithstanding *Panetti*'s analysis; (3) cannot pursue a second or successive motion through § 2255(h)(1), because the constitutional violations affected "only" his death sentence, not his conviction; and (4) cannot obtain relief under Rule 60(b), whether due to untimeliness (again, because the Government continued to hide the *Brady* material) or because his 60(b) motion is deemed a second or successive § 2255 motion, then he will be executed based on likely constitutional violations that – owing only to the Government's continued constitutional violations – have never been reviewed by any federal court. In such circumstances, has the writ of habeas corpus been unconstitutionally suspended?

### III.   STATEMENT OF THE CASE

#### A.   Introduction

Appellant Brandon Bernard, a death-sentenced federal prisoner, filed and litigated to conclusion an initial motion for relief under 28 U.S.C. § 2255. Bernard later discovered that the Government had concealed *Brady* information that would have supported meritorious challenges to his death sentence.

In brief, the Government concealed its law enforcement gang expert's conclusions that the gang to which all the defendants belonged was hierarchically organized and that Bernard occupied its very lowest position. The suppressed evidence directly contradicted the Government's arguments for why Bernard deserved death. Hiding this information very likely influenced Bernard's death sentence, because jurors spared his life on the other two death-eligible counts and struggled to reach the sole death verdict they returned.

After learning of this long-suppressed information, Bernard moved for appropriate relief in district court, advancing numerous theories under which the court might reach the merits of his claims. Though it called some of Bernard's procedural arguments "compelling," the district court concluded that it had to treat Bernard's motion as a successive § 2255 motion requiring prior authorization from this Court. The district court transferred the motion here in the interests of justice

4

under 28 U.S.C. § 1631, and Bernard has moved for authorization under cause number 19-50837.[3]

Bernard now appeals the district court's judgment, maintaining that even absent authorization under 28 U.S.C. § 2255(h), the district court had jurisdiction to review his claims.[4]

Even though Bernard can show that the Government illegally secured his death sentence by suppressing *Brady* evidence and misleading the jury, the Government's actions threaten to foreclose Bernard from vindicating his constitutional rights. Because the Government managed to hide expert law enforcement conclusions that favored Bernard until after his § 2255 was completed, any attempt to remedy that injustice now is arguably precluded as an unreviewable successive petition under Fifth Circuit law. *See*, *e.g.*, *In re Webster*, 605 F.3d 256, 257 (5th Cir. 2010) (to bring a successive claim under § 2255(h)(1), a federal prisoner must assert that "the newly discovered evidence would negate his guilt," as opposed to changing his sentence). This prospect is especially troubling here

---

[3] This Court has suggested that in the circumstances presented here, the clerk ordinarily should consolidate any motion for authorization under 28 U.S.C. § 2255(h) with any appeal of the propriety of a transfer order under §1631. See *United States v. Fulton*, 780 F.3d 683, 688 (5th Cir. 2015).

[4] This appeal requires no certificate of appealability. *See Fulton*, 780 F.3d at 688 (no COA is required to appeal a district court's order pursuant to §1631, transferring a § 2255 motion that it has deemed successive, because such an order does not "dispose of the merits of a § 2255 motion").

because, as a result of the Government's *Brady* and *Napue*[5] violations, jurors were misled regarding Bernard's own culpability and possible future dangerousness, and were therefore deprived of the ability to accurately assess the relative culpability of other participants in the crime as required by their instructions and 18 U.S.C. § 3592(a)(4). These are precisely the types of prosecutorial overreaching against which habeas corpus review is supposed to protect.

Unfortunately, in *Blackman v. Davis*, 909 F.3d 772 (5th Cir. 2018), *as revised* (Dec. 26, 2018), this Court held, apparently without qualification, that any *Brady* claim brought in a second habeas petition must satisfy 28 U.S.C. § 2244(b)(2) (although, as developed below, *Blackman* relies completely on the mistaken view that certain other decisions constitute binding precedent on this point). While Bernard maintains that there are multiple bases upon which jurisdiction is rightly premised in district court, *Blackman* figured prominently in the district court's conclusion that it lacked jurisdiction.

In appealing the district court's transfer decision, Bernard challenges the irrationality and unfairness of barring him from litigating violations of his fundamental constitutional rights where the Government concealed its misconduct throughout the time in which he could have raised them in his initial § 2255 motion.

---

[5] *Napue v. Illinois*, 360 U.S. 264, 269 (1959).

As Judge Weiner characterized the result in *Webster*, this is a "Kafkaesque" outcome best described as an "absurdity." *Webster*, 605 F.3d at 259 (Weiner, J., concurring).

### B.    Relevant procedural history

In the spring of 2000, Bernard and codefendant Christopher Vialva were jointly tried in the Western District of Texas on charges arising from a carjacking the previous summer that had ended in murder.[6] The case involved a plan by five teenagers to abduct and rob someone.[7] The plan went awry and ended with Vialva killing victims Todd and Stacie Bagley by shooting them in the head at close range, after which their car was set on fire. The Government sought the death penalty against Vialva and Bernard, who were convicted on all counts. Among other aggravating factors, jurors found that Bernard was "likely to commit criminal acts of violence in the future which would be a continuing and serious threat to the lives and safety of others." ROA.333. No juror found the mitigating factor that other participants who might be equally culpable would escape a death sentence.[8] ROA.335

---

[6] The charges were (1) carjacking resulting in death, *see* 18 U.S.C. § 2119; (2) conspiracy to commit murder, *see* 18 U.S.C. § 1117; and (3 and 4) the murders of Todd and Stacie Bagley, *see* 18 U.S.C. § 1111(a).

[7] The participants were Christopher Vialva (age 19), Bernard (18), Terry Brown (17), Tony Sparks (16), and Christopher Lewis (15).

[8] The three other teenagers were too young to face a death sentence under federal law. Brown and Lewis cooperated with the Government and testified at trial. Both have since

The judgment was affirmed on appeal. *United States v. Bernard*, 299 F.3d 467 (5th Cir. 2002). Bernard subsequently sought relief under 28 U.S.C. § 2255, which was denied. *See United States v. Bernard*, 762 F.3d 467 (5th Cir. 2014) (denying Certificate of Appealability), *cert. denied*, 136 S. Ct. 892 (2016).

On February 4, 2019, Bernard moved in district court for relief from his death sentence after learning that the Government had suppressed favorable information and consequently misled the jury as to critical sentencing factors. ROA.2245-2416. Bernard further argued that by successfully concealing its own misconduct throughout his original § 2255 proceeding, the Government had prevented him from timely presenting those sentencing-phase issues, and that a proper reading of *Panetti v. Quarterman*, 551 U.S. 930 (2007) rendered his second-in-time motion non-successive. Alternatively, Bernard contended, he should be entitled to review of these sentencing-phase claims in the district court via Rule 60(b). Finally, Bernard argued that if these jurisdictional bases were unavailable, the district court should rule that strictly applying § 2255(h) would violate the Suspension Clause of the United States Constitution, Art. I, § 9, cl. 2.

---

been released from federal custody. Sparks, who pleaded guilty separately and did not cooperate, was resentenced in 2018 to forty years' imprisonment, and is projected for release in October 2030.

The district court concluded that, although "compelling" arguments existed for reaching the merits of Bernard's claims, those arguments could not be squared with this Court's precedent.[9] ROA.2426. It also concluded that Bernard's motion fell outside Rule 60(b). ROA.2429-50. The district court initially dismissed the motion, but subsequently amended its judgment to transfer the matter to this Court pursuant to 28 U.S.C. § 1631. ROA.2442. Bernard timely appealed. ROA.2444-45.

### C. The facts establish that two harmful constitutional violations influenced Bernard's death sentence.

#### 1. Introduction: The common factual basis of Bernard's as-yet-unexamined sentencing-phase claims under Brady and Napue.

In 2018, Bernard learned for the first time that eighteen years earlier, prior to trial, the Government had possessed the opinions of a law enforcement expert that (1) the gang to which all the defendants were alleged by the Government to belong (the "212 PIRU Bloods") was hierarchically organized; (2) Bernard's codefendants Sparks, Vialva, and Brown occupied relatively high positions in that hierarchy; and (3) Bernard occupied its very bottom rung. The *Brady* claim arises from the Government's failure to disclose the existence of these expert opinions to Bernard's

---

[9] The District Judge who presided at Bernard's trial and later ruled on his original § 2255 motion was Walter Smith, who retired in 2016 after being reprimanded for misconduct and while still under judicial investigation. Bernard's case has since been assigned to District Judge Alan D. Albright, who issued the transfer order that is the subject of this appeal.

trial counsel; the *Napue* claim arises from the Government's having affirmatively misrepresented the gang at sentencing as not having been organized hierarchically at all, and then urging jurors to treat all the defendants as equally culpable for the Bagleys' deaths.

### 2. In 2018, the long-suppressed expert opinion of former Sgt. Sandra Hunt surfaced for the first time.

In early 2017, Bernard's codefendant Tony Sparks was granted resentencing under *Miller v. Alabama*, 567 U.S. 460 (2012).[10] *See Sparks v. United States*, No. W-99-CR-070-3, 2018 WL 1415775 (W.D. Tex., March 19, 2018) at *1 and n.1.

During Sparks' February 2018 resentencing hearing, the Government called former Killeen Police Department Sergeant Sandra Hunt as an expert witness. Sgt. Hunt had previously headed the KPD's Gang Unit; her testimony addressed Sparks' position within the 212 PIRU Bloods. ROA.2314-15.

The Government introduced two one-page documents in support of Sgt. Hunt's testimony. The first was a sheet of notebook paper obtained by law enforcement from a Killeen high school student in 1998. ROA.2413 (Government Exhibit 66 from *Sparks* resentencing hearing) and ROA.2317-21 (Sgt. Hunt's testimony explaining that exhibit). It comprised a scribbled handwritten chart

---

[10] The presiding judge in *Sparks* was Hon. Lee Yeakel.

decorated with arcane gang symbols and initials[11] and containing gang members' nicknames arranged roughly in the shape of a triangle.

The second one-page document was created the following year (1999) by the police themselves. It omitted most of the gang ephemera and replaced the gang members' nicknames with their true names, based on confidential information in KPD gang intelligence files. ROA.2414 (Government Exhibit 65 from *Sparks* resentencing hearing); ROA.2318-10 (Sgt. Hunt's related testimony). When the United States Attorney's Office was preparing for Bernard's trial in 1999, it contacted Sgt. Hunt to ask her whether and where certain individuals' names appeared in this document; Sgt. Hunt consulted it in the course of providing a full response. ROA.2321, 2318-2329.

As Sgt. Hunt explained in her 2018 testimony, the document originally obtained from the student and subsequently analyzed and refined by the police was actually a graphic representation of the gang's hierarchy. It showed that Sparks had held a relatively powerful position in the gang as an "enforcer," occupying the fifth rung of the hierarchy. ROA.2320-21. Sgt. Hunt identified the nickname "Dip" as referring to Bernard and acknowledged that Bernard, in contrast to Sparks, occupied

---

[11]The randomly placed decorations include a five-pointed star with the letters "B," "G," and "B" at three of its points; a six-pointed star with "2," "1," "2," "B," G," and "B" at its points, plus the letter "P" at its center and two down-pointing pitchforks; a cross with four dots; the letters "CK" with a slash through the "C"; and the phrases "5 * Time," "212 PIRU Blood," "5 * Deuce Villain," "Texas Boys," "311," "415," and "550."

the lowest level in the array. As she described it, Bernard's name was "at the very bottom" of the chart, "about 30 people below Mr. Sparks." ROA.2321. In fact, according to that reading of the chart, Bernard was located 36 people below Sparks: Sparks occupied position "10" in the hierarchy; while Bernard occupied position "46." ROA.2413-14.

### 3. Sgt. Hunt's expert opinion was suppressed by the Government.

Until undersigned counsel learned in early 2018 about Sgt. Hunt's testimony in *Sparks*, Bernard knew nothing of Sgt. Hunt's 1998-99 investigation and conclusions regarding the structure of the gang, or the fact that Sgt. Hunt had briefed the federal prosecutors in his case in 1999-2000 concerning her conclusions that the 212 PIRU Bloods had a hierarchical organization and that Bernard was at its very bottom. Nothing indicates that Sgt. Hunt's favorable expert opinions on those subjects were disclosed to Bernard's trial counsel prior to trial, and the record suggests the contrary.[12]

---

[12] For example, had Sgt. Hunt's conclusions been disclosed, Bernard's trial counsel surely would have used them to challenge the testimony of Texas Ranger John Aycock. After being called by the Government and asked specifically to address "who's in charge of Two-One-Two PIRU," Aycock testified that no hierarchy existed within the gang, explicitly denying – exactly contrary to Sgt. Hunt's 2018 testimony – that the gang had a pyramid structure. ROA.5382.

The record is unclear whether, prior to trial, the Government disclosed to Bernard's trial counsel either of the exhibits it submitted in *Sparks* to support Sgt. Hunt's testimony in 2018.[13] In any event, absent Sgt. Hunt's accompanying expert analysis and interpretation, those bare documents would have been insufficient to satisfy the Government's disclosure obligations under *Brady*.

### 4. Sgt. Hunt's expert opinion was both favorable and material under **Brady**.

Sgt. Hunt's expert conclusions are highly favorable to Bernard. First, her analysis showed that three of Bernard's codefendants (Sparks, Brown, and Vialva) ranked relatively high in the gang. As noted, she determined that Sparks, an "enforcer," sat on rung 5 near the top of the hierarchy. ROA.2320-21. Brown and Vialva occupied comparably high positions, on rungs 6 and 7 respectively. ROA.2321. Thus, Sgt. Brown's expert opinion established that Sparks, Brown, and Vialva occupied a status where they would likely have formed plans and made decisions – in short, acted as leaders in the gang's criminal activity.

---

[13] In its Response to Appellant's Motion to Authorize Successive Motion under 28 U.S.C. § 2255, or, in the Alternative, to Recall the Mandate in *Bernard v. United States*, 13-70113, the Government alleged only that it disclosed this scribbled handwritten chart, meaning it has never claimed to have disclosed Sgt. Hunt's critical expert testimony or the work that she had done to improve upon the scribbled chart. *See generally*, Reply to Government's Response at 10-11, *In re Bernard*, No. 19-50837 (filed December 3, 2019).

Equally important, Sgt. Hunt found that Bernard himself occupied the very lowest tier of the hierarchical structure. Her expert conclusions therefore showed that Sparks/Brown/Vialva had substantial authority within the gang, while Bernard had none, and was positioned to fall in line and do as he was told.

At the same time, Sgt. Hunt's conclusion that Bernard occupied a position at the very periphery of the gang was favorable, because it would have cast Bernard's whole connection to the gang in an entirely different light. Sgt. Hunt's expert opinion could have persuaded jurors that Bernard's links to the 212 PIRU Bloods were so weak that he was unlikely to seek out gang involvement in prison if his life were spared.

Further, Sgt. Hunt's status as a highly credible witness with a long career in law enforcement would have lent great weight to her opinions. Indeed, this is exactly what the presiding judge found when resentencing Mr. Sparks to a term of years. ROA.2342 (*Memorandum Opinion Regarding Resentencing*, *Sparks*, 2018 WL 1415775, at *6 (expressly crediting Sgt. Hunt's testimony to find that Sparks had acted as an enforcer and was "not a tangential participant in the gang") and ROA.2370-71 (Oral Ruling at 12, lines 15-16 (March 19, 2018)).

The suppressed information was not just favorable but material, because it is reasonably probable that disclosure of Sgt. Hunt's expert conclusions about the gang's structure and Bernard's minimal role would have changed the sentencing

verdict. A "reasonable probability" is one sufficient to undermine confidence in the outcome. *United States v. Bagley*, 473 U.S. 667, 682 (1985). Here, that analysis starts with recognizing that jurors spared Bernard's life on two of three capital counts, while sentencing Vialva to death on all three, ROA.5848-49, 5845-46. Even without knowing that a police expert had deemed Bernard to be at the gang's lowest rank, the jury spent nearly as much time deciding on Bernard's one death sentence as it did on its remaining sentencing verdicts for both defendants.[14] Given the Government's emphasis throughout trial on the threat posed by the 212 PIRU Bloods, expert evidence that Bernard occupied the gang's lowest rung would almost certainly have persuaded at least one juror to vote for life, particularly since jurors were required to evaluate both Bernard's own future dangerousness and whether other equally culpable criminal actors were not facing death.[15]

---

[14] Jurors retired to deliberate at about 4:15 p.m. on June 12, working until 7:00 p.m. *See* ROA.5842, 819, 821. In that interval, they sentenced Vialva to death on all three death-eligible counts, and sentenced Bernard to life imprisonment on two of those three. *See* ROA.301, 314, 327 (Vialva death verdicts, all dated June 12); ROA.341, 354 (Bernard life verdicts, same). Deliberations resumed the next morning at 9:00 a.m., *see* ROA.821, with only Bernard's final sentence to determine. That verdict required two additional hours of deliberations, which concluded at about 11:15 a.m. on June 13. ROA 822; see also ROA.366 (Bernard's single death verdict, dated June 13).

[15] ROA.359, 361; *see also* 18 U.S.C. §§ 3593(e), 3594 (under the Federal Death Penalty Act, unless the jury unanimously recommends death, a life sentence results).

***5. The Government affirmatively misled the jury when it falsely suggested, contrary to Sgt. Hunt's findings, that no hierarchy of authority or status existed in the 212 PIRU Bloods.***

Sgt. Hunt's expert analysis demonstrated that (1) the 212 PIRU Bloods gang, whose members carried out the carjacking that led to Todd and Stacie Bagley's deaths in June 1999, had an identifiable hierarchy of authority and status, and (2) at that time, Bernard's codefendants Sparks, Brown, and Vialva ranked near the top of that array while Bernard was at its very bottom. There is no reason to doubt the accuracy of those findings. Indeed, the Government itself expressly vouched for their integrity in 2018, when it invoked them in urging a lengthy prison term for Sparks.

Despite being aware of Sgt. Hunt's expert conclusions at the time of Bernard's sentencing, the Government did not share them with Bernard's trial counsel or the jury. Instead, the Government repeatedly elicited testimony and then argued at sentencing that the 212 PIRU Bloods gang in fact was *not* hierarchically organized and that all members enjoyed equal status, such that all should be regarded as equally culpable for the gang's crimes.

For example, the Government intentionally elicited testimony from cooperating codefendant Terry Brown that everyone in the gang was considered equal. ROA.5366-67. Likewise, the Government specifically elicited testimony from Ranger Aycock that the gang's founding members expressly wanted to avoid

16

a hierarchical structure, because that would cause too much confrontation within the gang. ROA.5382. All this testimony painted a grossly misleading picture of the gang, because the Government knew from Sgt. Hunt that some members of 212 PIRU *did* occupy positions of authority and status within the gang, and that Bernard, who existed on the gang's periphery, was definitely not one of them.

> **6. By presenting a false picture of the facts – telling jurors that the 212 PIRU Bloods lacked any hierarchical structure when its own expert had concluded to the contrary – the Government violated Napue and its progeny, and the violation was harmful.[16]**

A *Napue* violation requires reversal if any reasonable likelihood exists that the false or misleading testimony could have affected the jury's verdict. *Giglio v. United States*, 405 U.S. 150 (1972). That standard is met here.

---

[16] The Government may protest that in fact it possessed two clashing expert opinions – Ranger Aycock's (no hierarchy in the 212 PIRU Bloods) and Sgt. Hunt's (rigid hierarchy, with Bernard at the very bottom) – and simply chose to present the one that favored its position in the litigation. First, even if true, that would not overcome Bernard's *Brady* claim: the Government may be entitled to pick its preferred expert opinion, but if its experts disagree, it must disclose the contrary opinions to the defense. But more to the point, here only one proposition can be true as a matter of historical fact: the 212 PIRUs were either hierarchically organized or they weren't. Rather than attempt to answer this question based on the evidence and let the outcome dictate its positions in court, the Government decided to have its cake and eat it, too – embracing in different proceedings whatever version of the "facts" would support the severest punishment. At Bernard's sentencing, the Government concealed Sgt. Hunt's opinion and pressed the "no hierarchy" theory because depicting Bernard as equally culpable to other gang members helped secure a death verdict. At Sparks' re-sentencing, by contrast, the Government brandished Sgt. Hunt's expert opinion because painting Sparks as a leader of the gang made him appear more deserving of a lengthy prison term. Such conduct violates due process because it betrays the Government's solemn duty to do justice, rather than simply prevail in the litigation.

The Government's contention that Bernard was an irredeemable gang member, who would continue to embrace that identity in a prison environment, was a central theme of its case for death.   For example, prosecution witness Anthony Davis, an intelligence officer for the Federal Bureau of Prisons, asserted that Bernard would continue to pursue violent gang-related activities in prison. ROA.5730-31. Davis testified that "Bloods" in prison strive to organize, "recruit[ing] as many members as they possibly can" so that they can "continue their criminal behavior and activity, just like they did out in the streets." *Id*. And if they fail to recruit additional Bloods, these gang members inevitably end up joining "more violent and more sophisticated gang[s] in the prison system." *Id*.[17]

In the context of this presentation, the harm resulting from the Government's misleading claims that the 212 PIRU Bloods gang had no hierarchical structure, and that all members enjoyed equal status and authority within the gang, is apparent. In

---

[17] All this speculation has proven false. Bernard has been a model prisoner, has not been active in any gang, and has even counseled others to stay on the straight and narrow. Mark Bezy, formerly the warden at the very institution where Bernard is now incarcerated, reviewed Bernard's complete BOP file in 2016 and concluded that that he has been fully compliant. Bezy noted that Bernard has been allowed to work as an orderly, which reflects prison officials' confidence in his trustworthiness and good behavior, and that Bernard remarkably had not incurred a single disciplinary infraction during his time in the BOP (then 16 years). ROA.2399-40 (*Declaration of Warden Mark Bezy (Ret'd)* at 2 (August 20, 2016)). In fact, beyond simply staying out of trouble, Bernard has used his time constructively, counseling other youth not to be led astray. ROA.2401-12 (*Declarations of David and Michael Boyd and accompanying magazine article documenting Bernard's good works while in prison*).

particular, Ranger Aycock's testimony left the jurors with those false impressions, which no doubt influenced the jurors' evaluation of the relative culpability of the various actors in the crime. Such relative culpability was a statutory mitigating factor that jurors were legally obligated to consider and which, standing alone, would have been sufficient to support a juror's conclusion that death was an excessive punishment for Bernard.

## IV.   SUMMARY OF ARGUMENT

Brandon Bernard, just eighteen at the time of the crime, was a non-shooting codefendant with no serious history of prior violent crime. The jury spared his life on two of three capital counts and struggled over whether to sentence him to death at all. And it is now apparent that the Government secured Bernard's death sentence by hiding expert opinion that would have directly contradicted the theories on which the Government urged the jury to impose death. Critically, it hid that information not just during trial, but throughout Bernard's initial motion under 28 U.S.C. § 2255.

Bernard's second-in-time § 2255 motion, raising these issues, is not a second or successive motion under *Panetti*, and thus should have been considered by the district court, rather than transferred to this Court. Applying *Panetti*'s analysis, a contrary result would threaten Bernard with "forever losing [his] opportunity for any federal review" of his constitutional claim, solely due to the unconstitutional actions of the Government. 551 U.S. at 945-46. A ruling that petitioners cannot bring *Brady*

19

claims when the Government has hidden the violation throughout earlier § 2255 proceedings would require petitioners to bring such claims in their initial § 2255, at a time when that claim is speculative, rather than ripe. This would have serious negative "implications for habeas practice," *id.* at 943, without furthering AEDPA's goals of comity, finality, and federalism. Because the Government's improper conduct prevented Bernard from bringing his *Brady* and *Napue* claims earlier, his new motion does not constitute an "abuse of the writ," *id.* at 948, and thus is not what AEDPA sought to bar. Further, *Blackman*'s holding that every *Brady* claim in a second application must satisfy 28 U.S.C. § 2244(b)(2)(B), see 909 F.3d at 778-79 and n.2, was based on a mistaken conclusion that prior decisions constituted binding circuit precedent requiring that result.

Even if Bernard's motion were deemed successive under § 2255, the district court had jurisdiction to reach the merits of his claims under Rule 60(b), which grants the district court a "grand reservoir of equitable power[.]" *Wooten v. McDonald Transit Assocs., Inc.*, 788 F.3d 490, 501 (5th Cir. 2015) (citation omitted). Bernard's pleading qualified as a proper Rule 60(b) motion under *Gonzalez v. Crosby*, 545 U.S. 524 (2005), because it challenged Governmental action that undermined the integrity of the habeas proceeding. The fact that those actions represented a continuation of earlier *Brady* violations at trial – ones that ultimately would entitle Bernard to relief from his death sentence – do not affect the motion's validity under Rule 60(b).

Finally, holding that the district court lacked jurisdiction under either of these theories, and that Bernard cannot satisfy AEDPA because he attacks "only" his death sentence, and not his conviction, would violate the Suspension Clause. Licensing the Government to permanently bar an individual from raising a *Brady* violation that rendered his death sentence unconstitutional, simply by hiding that violation through the pendency of an initial § 2255, is intolerable under our Constitution.

## V.   ARGUMENT

**A.    Bernard's motion to the district court should not be deemed a second motion subject to 28 U.S.C. § 2255(h).**

*1.    Allowing Bernard's new* **Brady** *claim to be heard is "critically important to maintaining the integrity of our judicial system"; any other outcome would unfairly reward the Government for its own constitutional violation.*

"This court determines de novo whether a post-judgment motion for relief from judgment should be construed as an unauthorized, successive § 2255 petition." *United States v. Patton*, 750 F. App'x 259, 262 (5th Cir. 2018).

Ordinarily, a federal court does not entertain an application for post-conviction relief from a federal prisoner whose detention has survived a previous collateral attack, except as provided in 28 U.S.C. § 2255. *See* 28 U.S.C. § 2244(a). This is because § 2255(h) bars review of "[a] second or successive motion" for relief unless it (1) contains newly discovered evidence sufficient to establish the prisoner's

innocence, or (2) relies on a previously unavailable and retroactive "new rule of constitutional law[.]" This statutory provision aims to prevent prisoners from abusing the writ through intentionally prolonged litigation or repeatedly filing frivolous claims. *See Panetti,* 551 U.S. at 945-47**.** But under the principles the Supreme Court has set forth in *Panetti*, applying § 2255(h) to Bernard's claims would not serve those purposes, making his second-in-time motion not "second or successive."

Bernard's *Brady* claim warrants consideration because it rests on evidence the Government hid during his trial *and* during his prior habeas proceedings, thereby preventing him from raising the issue in his original petition. Nevertheless, under this Court's current precedent, a sentencing-phase *Brady* claim like Bernard's does not satisfy a literal reading of the criteria of § 2255(h).[18] Following that precedent here and deeming Bernard's current motion successive would deny him any judicial review of this violation of his fundamental rights. More pointedly, this procedural straightjacket would prevent the Court from correcting a death sentence that, had the Government played by the rules, would never have been imposed in the first place.

---

[18] *See In re Webster*, 605 F.3d 256, 257 (5th Cir. 2010). There is sister-circuit authority for the proposition that the § 2255(h) gateway should nevertheless be available to Bernard. *See Thompson v. Calderon*, 151 F.3d 918, 924 (9th Cir. 1998), *as amended* (July 13, 1998) (en banc).

In the following sections, Bernard will analyze the Supreme Court precedent supporting the conclusion that his motion should not be subject to the bar on "second or successive" applications imposed by 28 U.S.C. §§ 2254(a) and 2255(h). Before doing so, it is worth considering the corrosive effects that a contrary holding would have on the judicial system.

In *Scott v. United States*, 890 F.3d 1239 (11th Cir. 2018), the court examined the situation where a prosecutor not only hides material exculpatory or mitigating evidence prior to trial, but manages to do so until the defendant's first post-conviction proceeding concludes. The court started with the indisputable premise that under *Brady*, "a prosecutor's suppression of material evidence favorable to the accused amounts to a foul blow" that "deprives [him] of a fundamentally fair trial." 890 F.3d at 1243. As a result, allowing valid *Brady* claims to proceed "is critically important to maintaining the integrity of our judicial system." *Id.*

The injury to the legitimacy of the legal system inflicted by an initial *Brady* violation is actually compounded where the Government succeeds in concealing the violation throughout the prisoner's initial § 2255 proceeding. In such circumstances, "precluding the filing of a second-in-time petition addressing the newly discovered violation is doubly wrong." *Id.* at 1244. Specifically, barring such a second-in-time motion "rewards the government for its unfair prosecution" by immunizing the improperly obtained judgment from correction. *Id.* A contrary conclusion

23

"eliminates the sole fair opportunity for these petitioners to obtain relief," and not only "corrodes faith in our system of justice" but "undermines justice itself," such that it "cannot be allowed." *Id.* at 1243. *See also Douglas v. Workman*, 560 F.3d 1156, 1195 (10th Cir. 2009) (in enacting AEDPA, Congress "cannot" have aimed to encourage prosecutors to conceal exculpatory evidence "until it is too late, preventing the habeas petitioner from asserting the existence of such [exculpatory evidence] in his initial habeas petition and thereby insulating egregious government behavior from any habeas review").

> ### 2. **Panetti v. Quarterman** *establishes that a second-in-time application for collateral relief does not always constitute a "second or successive" motion subject to the strictures of § 2255.*

In *Panetti*, the Court held that a prisoner need not raise in his initial habeas petition the possibility that he may become incompetent at a later date, and thus be barred from execution under *Ford v. Wainwright*, 477 U.S. 399 (1986). *Panetti*'s logic compels the conclusion that the district court had jurisdiction to entertain Bernard's 2018 motion.

*Panetti* analyzed the question of what constitutes a second or successive motion in light of both AEDPA's purposes (to further "comity, finality, and federalism") and "the practical effects" of its own holdings, including the "implications for habeas practice" and the abuse of the writ doctrine. 551 U.S. at

945-47. The Court observed that focusing on these considerations was especially appropriate in situations where, as here, a proposal to impose a particular procedural hurdle would threaten a petitioner with "forever losing [his] opportunity for any federal review . . ." of a particular constitutional claim. *Id*. at 945-46.

The Court began by examining the implications for habeas practice of a rule requiring a petitioner to raise a speculative claim about possible future incompetency – a claim for which no facts would have existed – in his initial habeas petition, so as to preserve it for possible future review. The Court rightly concluded that such a rule would have a "far reaching and seemingly perverse" impact, since the recognized risk of eventual cognitive deterioration would require a prisoner with no apparent mental problems at the time of his initial habeas filing to assert such a claim anyway. *Panetti*, 551 U.S. at 943 (quoting *Stewart v. Martinez-Villareal*, 523 U.S. 637, 644 (1998)). Such a rule would force conscientious defense attorneys to file unripe and often meritless *Ford* claims. *Id.* The Court rejected this "counterintuitive" approach, *id*., finding that it would "add to the burden imposed on courts, applicants, and the States, with no clear advantage to any." *Id.* at 931.

The Court then explained that "[t]he phrase 'second or successive' is not self-defining," but instead takes its meaning from the case law, including the dense web of habeas corpus decisional law that predated AEDPA. *Id.* at 943-44. The Court noted that it had already recognized in other contexts that not every second-in-time

25

habeas application is "second or successive." It emphasized that its precedent

required looking to the implications for habeas practice when interpreting the term.

*Id.* at 945.

In reaching its conclusion that the second-in-time petition presenting Panetti's

*Ford* claim was not "second or successive" under the statute, the Court looked to the

AEDPA's purpose of furthering "the principles of comity, finality, and federalism."

*Panetti*, 551 U.S. at 945 (quoting *Miller–El v. Cockrell*, 537 U.S. 322, 337 (2003).[19]

It sought to balance those goals with the need to avoid "forever" denying petitioners

the opportunity for any federal review of previously unavailable claims. *See Panetti*,

551 U.S. at 945-46 (quoting *Rhines v. Weber*, 544 U.S. 269, 275 (2005)). The Court

---

[19] *Panetti* concerned a state prisoner's claim brought under § 2254, while the present case concerns a federal prisoner's claim brought under § 2255. Thus, the concerns of comity and federalism that underlie AEDPA – the desire to respect state-court judgments and reduce friction between state and federal courts exercising habeas jurisdiction – are not in play here. The *Panetti* Court's analysis applies to Bernard's situation notwithstanding those differences; if anything, the absence of comity and federalism concerns dictates a rule that provides greater protection for a prisoner's ability to seek relief in a second-in-time motion. This point is made in *Panetti* itself, which explicitly declares that finality concerns are "not implicated" by giving district courts jurisdiction to hear previously unreviewable claims. *See Panetti*, 551 U.S. at 946 ("AEDPA's concern for finality, moreover, is not implicated, for under none of the possible approaches would federal courts be able to resolve a prisoner's *Ford* claim before execution is imminent"). In making this point, Bernard recognizes that this Court has stated that "second or successive," as a term of art, carries the same meaning for both § 2254 and § 2255 petitions. *See*, *e.g.*, *In re Lampton*, 667 F.3d 585, 587-88 (5th Cir. 2012). In Bernard's view, those decisions fail to acknowledge *Panetti*'s plain implication that the absence of comity and federalism concerns in the § 2255 context dictate defining "second or successive" more leniently for federal prisoners. While Bernard concedes that those decisions constitute binding precedent, he notes this issue to preserve it for further review.

noted that absent clear indication of contrary Congressional intent, it would resist interpreting the habeas statute in a way that would "produce troublesome results," "create procedural anomalies," and "close our doors to a class of habeas petitioners seeking review[.]" *Id.* at 946 (quoting *Castro v. United States*, 540 U.S. 375, 380 (2003)).

The Court then elaborated on its view that requiring prisoners to file unripe *Ford* claims would not further AEDPA's goals. Such a mandate would not "conserve judicial resources, 'reduc[e] piecemeal litigation,' or 'streamlin[e] federal habeas proceedings.'" *Id.* (quoting *Burton v. Stewart*, 549 U.S. 147, 154 (2007) (per curiam) (bracketing in *Panetti*)).

In finding jurisdiction, the Court noted that AEDPA's successive-application bar was designed to restrain "what is called in habeas corpus practice 'abuse of the writ.'" *Id.* at 947 (quoting *Felker v. Turpin*, 518 U.S. 651, 664 (1996)). The "abuse of the writ" doctrine reflected an equitable interest in foreclosing repeated habeas motions from prisoners who lacked good grounds for failing to bring particular claims earlier. *See*, *e.g.*, *McCleskey v. Zant*, 499 U.S. 467, 484-85 (1991). Panetti, of course, had good grounds for not bringing his *Ford* claim earlier, since it was unripe. Thus, allowing Panetti's second-in-time petition in no way frustrated AEDPA's goal of curtailing actual "abuse."

The Court emphasized its reluctance to interpret the relevant statutory language in a manner at odds with the realities of post-conviction practice, and concluded that Panetti's claim was properly before the federal district court:

> We are hesitant to construe a statute, implemented to further the principles of comity, finality, and federalism, in a manner that would require unripe (and, often, factually unsupported) claims to be raised as a mere formality, to the benefit of no party.
>
> The statutory bar on 'second or successive' applications does not apply to a *Ford* claim brought in an application filed when the claim is first ripe. Petitioner's habeas application was properly filed, and the District Court had jurisdiction to adjudicate his claim.

*Id.* at 947.

> **3.** ***Under* Panetti, *a second-in-time motion for post-conviction relief that alleges a* Brady *claim is not "second or successive" if the Government, by continuing to conceal material evidence, prevented the prisoner from including the claim in his original motion.***

Although *Brady* and *Ford* claims differ in their substance, the *Panetti* analysis applies in the same way to both. The *Scott* court addressed this issue, both through discussing the destructive consequences for the integrity of the legal system of barring late-discovered *Brady* claims, and also explaining specifically why *Panetti* compels the conclusion that a second-in-time motion alleging a *Brady* claim is not "successive" if the prisoner, acting with reasonable diligence, could not have discovered the violation at the time of his first motion.

*Scott*, like the case at bar, involved a § 2255 petition. A previous panel of the Eleventh Circuit addressing the same issue in the § 2254 context had already reached the opposite conclusion. *Tompkins v. Secretary, Department of Corrections*, 557 F.3d 1257 (11th Cir. 2009). The *Scott* panel ultimately determined that it was bound by *Tompkins.* As a result, *Scott*'s well-reasoned conclusions about why the *Panetti* analysis should apply to *Brady* claims are not the law of the Eleventh Circuit. However, a comparison of the analysis in *Scott* with the conclusion in *Tompkins* shows that *Tompkins* did not even apply the *Panetti* analysis and thus ultimately is "fatally flawed[.]" 890 F.3d at 1258.

a. *Scott's* analysis of the *Panetti* considerations

The *Scott* court first looked to how the *Panetti* Court analyzed the issue of what constitutes a "second or successive" petition as to *Ford* claims. *Scott* observed that the Supreme Court had "looked solely to three considerations: (1) the implications for habeas practice if the Court found it lacked jurisdiction over Panetti's claim; (2) the purposes of AEDPA; and (3) the pre-AEDPA abuse-of-the-writ doctrine." *Scott*, 890 F.3d at 1248 (citing *Panetti*, 551 U.S. at 943-47). It then addressed the question of *Brady* claims in light of those three considerations.

As to the first consideration, the *Scott* court concluded that "precluding *Brady* claims that a prisoner could not have discovered through due diligence would adversely affect habeas practice." *Id.* at 1250. The nature of *Brady* claims – that they

29

involve evidence that was not properly disclosed by the Government prior to trial –
means that even diligent prisoners often cannot discover them unless the
Government belatedly discloses them. Just as with *Ford* claims, such a regime would
require the filing of "unripe (and, in many cases, meritless) [*Brady*] claims in each
and every [first § 2255] application [(and direct appeal)]." *Id.* at 1250 (quoting
*Panetti*, 551 U.S. at 943) (bracketed material in *Scott*). Only such protective filings
would "preserve then-hypothetical claims on the chance that the government might
have committed a material *Brady* violation that will eventually be disclosed." *Id.*
Thus, as with *Ford* claims, such an inflexible rule would force the courts to address
an "avalanche of substantively useless *Brady* claims[.]" *Id.* at 1250-51. In fact, the
burden of treating *Brady* claims in this manner would be "even more deleterious"
than with *Ford* claims, since *Ford* applies only in capital cases, while *Brady* applies
to any case. *Id.* at 1251.

The *Scott* court then turned to the second *Panetti* consideration, finality
interests. For two reasons, it concluded that the second-in-time filing of a previously
unavailable *Brady* claim, like a comparable *Ford* claim, would not undermine
AEDPA's finality concerns. *Id.*

For one thing, the *Scott* court pointed out, finality is generally important
because a new trial can prejudice the Government, given the difficulty in prosecuting
a long-past offense. But because "the government alone holds the key to ensuring a

30

*Brady* violation does not occur" in the first place, any such problem would be of the Government's own making. *Id.* "Whatever finality interest Congress intended for AEDPA to promote, surely it did not aim to encourage prosecutors to withhold constitutionally required evidentiary disclosures long enough that verdicts obtained as a result of government misconduct would be insulated from correction." *Id.* For another, precluding a remedy in this situation might undermine the criminal law's deterrent effect (a value that emphasizing finality aims to serve), because procedural fairness is integral to the law's perceived legitimacy, and "legitimacy affects compliance." *Id*. at 1252.

The third *Panetti* consideration is the abuse-of-the-writ doctrine. Under that longstanding doctrine, a claim presented in a second habeas application was not abusive (and thus could be reviewed on the merits) if the prisoner could demonstrate cause for not raising the claim sooner and prejudice from the alleged legal violation. *McCleskey*, 499 U.S. at 490. "A petitioner satisfies the cause requirement where he can demonstrate 'interference by officials that makes compliance with the ... procedural rule impracticable, and a showing that the factual or legal basis for a claim was not reasonably available to counsel.'" *Scott*, 890 F.3d at 1253 (quoting *McCleskey*, 499 U.S. at 493-94) (ellipsis in *Scott*). A *Brady* violation that a petitioner could not reasonably have discovered meets that criterion. *Id.* (citing *Strickler v. Greene*, 527 U.S. 263, 289 (1999)). *See Strickler*, 527 U.S. at 283 ("it is just such

31

factors [nondisclosure of exculpatory material and a purported open file policy] that ordinarily establish the existence of cause"). The materiality component of a *Brady* claim – that no violation exists unless timely disclosure of the evidence would have created a reasonable probability of a different outcome – meets the prejudice requirement. *Id.* Thus, it does not "abuse the writ" to bring a second motion alleging a *Brady* violation, where the petitioner could not reasonably have discovered that claim at the time of his first motion.

The *Scott* court summarized its view as follows:

> In short, all the *Panetti* factors – the implications for habeas practice, the purposes of AEDPA, and the abuse-of-the-writ doctrine – compel the conclusion that second-in-time *Brady* claims cannot be "second or successive" for purposes of § 2255(h). And nothing *Panetti* teaches us to consider so much as hints otherwise.

*Id.* (footnote omitted).

The court also cautioned that any contrary holding could violate the Suspension Clause of the U.S. Constitution, Art. I, §9, cl. 2. *Id.* at 1243. It summarized its analysis as follows: "Supreme Court precedent, the nature of the right at stake here (the right to a fundamentally fair trial), and the Suspension Clause . . . require the conclusion that a second-in-time collateral claim based on a newly revealed actionable *Brady* violation is not second-or-successive for purposes of AEDPA." *Id.* at 1259.

b. *Scott's* analysis of *Tompkins*

The court then turned to *Tompkins*, which involved minimal discussion or analysis. *See Scott*, 890 F.3d at 1258 (criticizing the *Tompkins* panel for its "failure to adhere to – or even attempt to apply – the *Panetti* factors").

The *Scott* court rejected *Tompkins'* conclusion that the Supreme Court in *Panetti* had restricted its analysis to *Ford* claims, stating that "[n]either *Panetti*'s language nor its analysis supports such a conclusion." *Id.* at 1254. For example, the *Scott* court noted that *Panetti* spoke in the plural of multiple "exceptions" to the rule that second-in-time petitions fail AEDPA's "second or successive" bar. *Panetti* also spoke generally of multiple factors relevant to its conclusion, none of which applies exclusively to *Ford* claims. Finally, the *Panetti* Court had pointed to various aspects of its prior decisions, not directly involving the "second or successive" question, in which it had taken a broader view of petitioners' rights to the habeas remedy. This analysis reaffirmed that when examining any question about the scope of procedural restrictions on post-conviction review, a court must consult the implications for habeas practice and for AEDPA's purposes. *Id.* at 1254-55.

Second, the *Tompkins* court had looked to *Panetti*'s statement that "*Ford*-based incompetency claims, as a general matter, are not ripe until after the time has run to file a first federal habeas petition." *Tompkins*, 557 F.3d at 1259-60 (quoting *Panetti*, 551 U.S. at 942) (internal quotation marks omitted). In the view of the

*Tompkins* court, *Brady* claims are ripe when the violation occurs (*i.e.* when the material information is initially withheld). But, as *Scott* points out, *Panetti* did not define the term, and in fact "ripeness" is generally defined contrary to the *Tompkins* definition. "'Ripeness' refers to '[t]he state of a dispute that has reached, but has not passed, the point when the facts have developed sufficiently to permit an intelligent and useful decision to be made.'" *Scott*, 890 F.3d at 1256 (quoting *Ripeness*, Black's Law Dictionary (10th ed. 2014)).

The *Scott* court got it right: its definition of "ripeness" is consistent with the Supreme Court's and this Court's. *See*, *e.g.*, *Texas v. United States*, 523 U.S. 296, 300 (1998) (claim is unripe "if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all") (internal quotation marks and citation omitted); *Shields v. Norton*, 289 F.3d 832, 835 (5th Cir. 2002) (to be ripe, a claim "must not be premature or speculative"); *Monk v. Huston*, 340 F.3d 279, 282 (5th Cir. 2003) ("A case is generally ripe if any remaining questions are purely legal ones; conversely, a case is not ripe if further factual development is required"; a claim is unripe "when the case is abstract or hypothetical") (citation omitted); *United Transp. Union v. Foster*, 205 F.3d 851, 857 (5th Cir. 2000) ("Ripeness separates those matters that are premature because the injury is speculative and may never occur from those that are appropriate for judicial review.").

Under each of these tests, a *Brady* claim is unripe if asserted when a defendant cannot show that material evidence was suppressed. Such a claim "rests upon contingent future events" that may not occur, namely, discovery that material information was, in fact, suppressed. Without that trigger, any such claim would be "speculative." Not only would further "factual development [be] required," the claim ex ante would be fully "hypothetical." In short, a *Brady* claim advanced when no suppression has yet been discovered is quintessentially "unripe" under *Panetti* and this Court's case law.

Furthermore, as *Scott* points out, the exact definition of "ripeness" does not matter. *Panetti* referred to ripeness only in terms of analyzing the implications on habeas practice of treating a claim as second or successive. *Scott,* 890 F.3d at 1256 (citing *Panetti*, 551 U.S. at 943-45). In other words, "ripeness" was not a litmus test in *Panetti*; it was simply *relevant* to the ultimate test – the implications for habeas practice.

In short, as *Scott* succinctly put it, "*Tompkins* got it wrong[.]" *Id.* at 1243.

The judges in the unanimous panel in *Scott* are not alone in concluding that a rule that outlaws consideration of meritorious *Brady* claims – when the Government has successfully kept the requisite facts hidden until after a prisoner can no longer amend his initial § 2255 motion – would mock justice by rewarding unethical prosecutors. In *Allen v. Mitchell*, 757 Fed. App x. 482 (6th Cir. 2018), Judge Moore

in dissent stated, "treating Allen's *Brady* claim as second or successive would incentivize state prosecutors to withhold materially exculpatory evidence until after a petitioner exhausts his initial federal habeas claims; . . . foreclosing adjudication unnecessarily restricts federal habeas review of *Brady* violations." *Id.* at \*4.

> **4.     *No Fifth Circuit decision has analyzed whether a previously unavailable* Brady *claim is successive under* Panetti*; in treating the question as settled in this Court,* Blackman *mistakenly relied on cases that in fact had not addressed the issue.***

The above discussion shows that, under *Panetti*, Bernard's petition should not be deemed second or successive. This Court briefly addressed the second or successive question in the context of *Brady* claims in *Blackman v. Davis*, 909 F.3d 772 (5th Cir. 2018), *as revised* (Dec. 26, 2018). The *Blackman* panel did not independently analyze Blackman's assertion – that his *Brady* claim was not successive because the Government's continued suppression of the exculpatory information prevented him from raising the claim earlier. Instead, it stated that this Court had already "conclusively" rejected that view. *Id.* at 778. In so holding, the court cited three prior decisions.

The first, *In re Davila*, 888 F.3d 179 (5th Cir. 2018), provides no support for *Blackman*'s sweeping conclusion. It is true that the *Davila* court "applied this statutory provision [the "second or successive" gateway] to a petitioner's *Brady* claims and held that the requirements for pursuing a successive petition were not

fulfilled." *Blackman*, 909 F.3d at 778. But Davila never contended that the second or successive gateway did not apply; he argued only that he met the gateway requirements. *Davila*, 888 F.3d at 182. Unsurprisingly, the court therefore considered only whether Davila met the standard for second or successive petitions. *Id.* at 182-87. However, "'a question not raised by counsel or discussed in the opinion of the court' has not 'been decided merely because it existed in the record and might have been raised and considered.'" *De La Paz v. Coy*, 786 F.3d 367, 373 (5th Cir. 2015) (quoting *United States v. Mitchell*, 271 U.S. 9, 14 (1926)). Thus, *Davila* is not precedent on the question of whether *Brady* claims are governed by the second or successive gateway.

The second case that the *Blackman* panel characterized as "clear" precedent was *Leal Garcia v. Quarterman*, 573 F.3d 214, 222 (5th Cir. 2009). But *Leal* did not address a *Brady* claim and actually concluded that Leal's claim (pertaining to guarantees of consular access) was *not* second or successive. In the course of its discussion, the *Leal* court made various general pronouncements about what types of claims might be second or successive. The court was careful not to issue definitive rulings about the types of claims not before it, instead speaking broadly of claims that, *e.g.*, "tend to be labeled successive," "tend to be deemed non-successive," or "may be non-successive." 573 F.3d at 222.

In fact, the *Leal* court made one comment strongly supporting Bernard's position: it observed that if "the purported defect did not arise, *or the claim did not ripen*, until after the conclusion of the previous petition, the later petition based on that defect may be non-successive." *Id.* at 222 (emphasis added). As discussed above, the usual definition of "ripen" requires that the facts be "developed sufficiently to permit an intelligent and useful decision to be made." *Scott*, 890 F.3d at 1256 (quoting *Ripeness*, Black's Law Dictionary (10th ed. 2014)). This definition is consistent with the various definitions of "ripeness" the Supreme Court and this Court have endorsed, *see* cases cited at p. 34, *supra,* namely, those in *Panetti, Scott, Texas, Shields, Monk,* and *United Transp. Union.* And in the case of a *Brady* claim, ripeness in this sense occurs only when the defendant becomes aware that the Government has withheld favorable information. *Scott*, 890 F.3d at 1256.

The *Leal* court did state, as quoted in *Blackman*, that under AEDPA, even "claims based on a factual predicate not previously discoverable are successive." 573 F.3d at 221. But the reading of AEDPA that *Leal* was rejecting was the assertion that *any* new evidence would be sufficient to avoid applying that bar. A *Brady* issue, though, is not like every other claim of newly available evidence; instead, it involves Government *suppression* of evidence – *i.e.*, misconduct by one of the parties to the litigation, intended to deprive the other party of a fair determination of the merits. The *Leal* court did not consider *Panetti*'s analysis, looking to the "implications for

habeas practice" of categorizing a particular type of claim as successive, and it especially did not do so for *Brady* claims specifically. *See Panetti*, 551 U.S. at 945. This is unsurprising; given the limited question before it, the *Leal* court had no occasion to undertake that sort of inquiry. In short, the single passage in *Leal* quoted by *Blackman* is hardly "clear precedent" for treating *Brady* claims as successive under *Panetti.*

The final case *Blackman* cited was *Johnson v. Dretke*, 442 F.3d 901 (5th Cir. 2006). As in *Davila*, Johnson never argued that he was exempt from having to satisfy the criteria for consideration of a second or successive petition. Accordingly, the court had no reason to rule on that question. With the "question not raised by counsel or discussed in the opinion of the court," *Johnson* never decided whether *Brady* claims are governed by the second or successive requirements. *See De La Paz*, 786 F.3d at 373. *Johnson* is not precedent at all, let alone clear precedent, on that distinct issue.[20]

In short, none of the cases *Blackman* cited constitute precedent dictating the conclusion that, notwithstanding *Panetti*, a previously unknown *Brady* claim is properly treated as "second or successive." And *Blackman* itself offers no analysis supporting that proposition.

---

[20] The one other decision relied on by the district court, *In re Coleman*, 344 F.App'x 913 (5th Cir. 2009), is comparable to *Johnson.*

### 5. *For the same reasons,* **Panetti** *makes Bernard's* **Napue** *allegation reviewable.*

As discussed in Section III.C.6, the Government also violated *Napue* by intentionally misleading the jury into believing that the gang lacked any hierarchical organization structure. For the reasons discussed above, when a *Napue* violation could not be discovered due to a continuing *Brady* violation, a § 2255 motion raising that *Napue* violation should likewise not be deemed second or successive. *See Panetti* and *Scott*. And it should also be noted that this Court has recognized that the burden of showing prejudice sufficient to warrant relief for a *Napue* violation is "considerably less onerous" than that for a *Brady* violation. *Kirkpatrick v. Whitley*, 992 F.2d 491, 497 (5th Cir. 1993).

### B. Even if Bernard's motion were deemed successive, he is entitled to relief.

#### 1. *Bernard is entitled to relief under Rule 60(b).*

##### a. Bernard's motion meets the requirements for relief under Rule 60(b).

If, notwithstanding the arguments laid about above, this Court concludes that a second-in-time motion to the district court raising a *Brady* issue should be deemed "second or successive," it should nevertheless conclude that the district court possessed jurisdiction to grant the requested relief under Rule 60(b). Various subsections of that Rule allow relief from a final judgment for, *inter alia*, (1) mistake or excusable neglect; (2) "newly discovered evidence that, with reasonable

40

diligence, could not have been discovered in time to move for a new trial under Rule 59(b)"; (3) fraud, misrepresentation, or misconduct by an opposing party; or (6) any other reason that justifies relief.

This last provision provides a "grand reservoir of equitable power[.]" *Wooten*, 788 F.3d at 501. "[I]t provides courts with authority 'adequate to enable them to vacate judgments whenever such action is appropriate to accomplish justice,'" so long as there are "extraordinary circumstances." *Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 864 (1988) (citation omitted).

Subsections (1) – (3) require that the motion be filed within a year of the underlying judgment. But in a case like this one – where the moving party could not have done so because an opposing party successfully and wrongfully hid the necessary evidence – the triggering date for seeking Rule 60(b) relief should run not from the date of judgment, but from the date the previously hidden evidence was discovered. As noted above, that date was February 21, 2018, when Sgt. Sandra Hunt testified publicly in Tony Sparks' resentencing hearing.

The limitations period should be subject to equitable tolling. *See In re Benjamin's-Arnolds, Inc.*, 1997 WL 86463, *10 n.9 & *11 n.10 (Bankr. D. Minn. Feb. 28, 1997) (doctrine of equitable tolling could act to toll one-year limitations period of Rule 60(b)(3) until time fraud is actually discovered); *see also Holmberg v. Ambrecht*, 327 U.S. 392, 396-97 (1946) (noting that "fraudulent conduct on the

part of the defendant may have prevented the plaintiff from being diligent and may make it unfair to bar appeal to equity because of mere lapse of time" and thus concluding that limitations period does not begin to run until fraud is discovered). To hold otherwise would unfairly reward a party for managing to successfully conceal its fraud beyond the one-year limitations period. *Holmberg*, 327 U.S. at 396-97 (equity "bars a defendant from setting up … a fraudulent defense, as it interposes against other forms of fraud.").

Because the Government misled Bernard, directly impeding his ability to timely raise his *Brady* claim during his § 2255 proceedings, or even raise a timely Rule 60(b)(3) motion, equitable tolling was warranted here. *See Curtiss v. Mount Pleasant Corr. Facility*, 338 F.3d 851, 855 (8th Cir. 2003) (circumstances warranting equitable tolling include state conduct that "lulled the petitioner into inaction"); *Pliler v. Ford*, 542 U.S. 225, 235 (2004) (O'Connor, J., concurring) ("if the petitioner is affirmatively misled … by the State, equitable tolling might well be appropriate").

Even if equitable tolling would not apply under subsections (1) – (3), the rule enlarges the time for filing to "within a reasonable time," Rule 60(c)(1), in circumstances governed by Rule 60(b)(6). Ordinarily, "an action cannot be brought through … Rule 60(b)(6) if it could have been brought through one of the Rule's first five subsections." *United States v. Fernandez*, 797 F.3d 315, 319 (5th Cir.

2015). But the leading treatise on federal civil practice and procedure says courts have followed a "flexible approach" in applying this provision. *See* 11 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure Civ. § 2864 (3d ed.). "The courts have echoed, as they must in the light of *Ackermann* [*v. United States*, 340 U.S. 193 (1950)], the view that clause (6) is reserved for cases involving extraordinary circumstances, and they have said that that clause and the other clauses of the rule are mutually exclusive." *Id.* (footnote omitted). "At the same time they have acted on the premise that cases of extreme hardship or injustice may be brought within a more liberal dispensation than a literal reading of the rule would allow." *Id.*

For example, in *Jung Ai Shin v. U.S. Citizenship & Immigration Servs.*, No. CV 12-2839-GHK SSX, 2013 WL 571781 (C.D. Cal. Feb. 13, 2013), the court granted a Rule 60(b)(6) motion to order the Immigration Service to amend the plaintiff's naturalization certificate. The Government had objected that the motion was properly brought under Rule 60(b)(1) or (2), because it was based on newly discovered evidence about Shin's true birth date, and that those subsections are mutually exclusive with Rule 60(b)(6). *Id.* at *2. The court concluded that because the plaintiff could not have filed a timely Rule 60(b)(1) motion, it was bound to hold that "Plaintiff is seeking relief for reasons other than those enumerated under the first five clauses of Rule 60(b)." *Id.* (footnote omitted).

Literally speaking, of course, the plaintiff in *Jung Ai Shin* was invoking either mistake or newly discovered evidence, which are the first and second enumerated clauses under Rule 60(b). Nevertheless, the court rightly ruled that the flexible approach of Rule 60(b) allowed it to grant relief:  it recognized that because of the case's unusual posture, "adjudication of Plaintiff's application under Rule 60(b)(6) is appropriate." *Id.* Indeed, the same court later explicitly recognized this, characterizing its decision in *Jung Ai Shin* as "grant[ing] Rule 60(b)(6) relief in a situation that 'logically must fall under Rule 60(b)(1) or (b)(2),'" but where "'the unique circumstances of th[e] case [and] balance of equities' necessitated a less harsh result." *Karam v. Corinthian Colleges, Inc.*, No. CV106523GHKPJWX, 2015 WL 13593539, at *3 (C.D. Cal. Mar. 4, 2015) (second and third brackets in *Karam*). *See also, Trinh v. United States Citizenship & Immigration Servs.*, No. 14-MC-80337-MEJ, 2015 WL 2088766, at *4 (N.D. Cal. May 5, 2015) (granting relief under Rule 60(b)(6) under same analysis as in *Shin*); *Ampadu v. U.S. Citizenship & Immigration Servs., Dist. Dir.*, 944 F. Supp. 2d 648, 656 (C.D. Ill. 2013) (same); *Ho v. Dep't of Homeland Sec.*, No. SACV12805JLSRNBX, 2014 WL 12572927, at *4 (C.D. Cal. Feb. 11, 2014) (finding court had jurisdiction to hear motion under Rule 60(b)(6)).

As noted in the passage from Wright and Miller, Rule 60(b)(6) requires a finding of "extraordinary circumstances." *Accord*, *Wooten*, 788 F.3d at 501. The

44

prospect of Bernard's being put to death – when the Government withheld material that probably would have foreclosed a unanimous vote for death – constitutes such extraordinary circumstances.

> b. Bernard's alternative motion under Rule 60(b) is not a successive habeas motion under *Gonzalez*.

Under *Gonzalez v. Crosby*, 545 U.S. 524 (2005), some purported Rule 60(b) motions brought in habeas proceedings are deemed successive habeas petitions, and thus must satisfy AEDPA's gatekeeping standards. However, a Rule 60(b) motion may still properly be brought to cure a "defect in the integrity of [previously litigated] federal habeas proceedings," when those defects were produced by actors or factors outside the control of the petitioner or his counsel. *Gonzalez*, 545 U.S. at 532 and n. 5.

Here, the defect in the integrity of the proceedings was the Government's continued withholding of the *Brady* material previously identified, combined with its assertion during the § 2255 proceeding that it had previously complied with *Brady* by providing an "open file" prior to trial. ROA.1569. The district court specifically cited this supposed open file policy in denying Bernard's initial § 2255 motion and his request for discovery. ROA.1741. Absent the Government's false representation during the § 2255 proceeding that it had previously disclosed all exculpatory material, Bernard would have learned of the *Brady* material through

court-ordered discovery, amended his pleadings to include this *Brady* violation, and obtained sentencing-phase relief.[21]

One might superficially equate a substantive challenge to the trial judgment in this case with an allegation of a defect in the post-conviction proceedings, because similar facts underlie both violations. But that equation would be false, because the challenges are in fact distinct.

The first violation (the constitutional violation) occurred when the Government withheld *Brady* material at trial. That violation led to an unfair sentencing hearing. If that were Bernard's sole allegation, then it would be one directed to the original trial.

But the second violation occurred when the Government represented during the § 2255 proceeding that it had complied with *Brady* at trial. *That* violation undermined the integrity of the post-conviction proceeding itself. This second violation is what justifies reopening Bernard's original § 2255 proceeding; once that happens, the district court can determine whether the first violation warrants sentencing relief.

---

[21] *Cf. Strickler*, 527 U.S. at 283 n. 23 (1999) ("if a prosecutor asserts that he complies with *Brady* through an open file policy, defense counsel may reasonably rely on that file to contain all materials the State is constitutionally obligated to disclose under *Brady*.")

The two violations certainly involve the same underlying *Brady* material and the same *type* of Government action. But the merits of Bernard's attack on his death sentence do not depend on the second violation, so the Rule 60(b) claim, which rests on the second violation, is "a non-merits based" challenge to the § 2255 proceedings. *See In re Edwards,* 865 F.3d 197, 204 (5th Cir. 2017) (citation omitted).

The district court concluded that, because Bernard ultimately sought to file an amended petition alleging the underlying *Brady* and *Napue* violations, his 60(b) motion *itself* constituted a successive petition, despite its reliance on the fact that the continuing withholding of *Brady* material separately undermined the integrity of the § 2255 proceeding.

That conclusion was erroneous, and this Court reviews that determination de novo. *Edwards*, 865 F.3d at 202–03. That the defect in the § 2255 proceedings might ultimately lead to relief from Bernard's death sentence does not transform Bernard's Rule 60(b) motion into a successive petition. As the Tenth Circuit has recognized, a motion cannot be deemed improper under Rule 60(b) simply because success on the motion would ultimately lead to a claim for relief under § 2255. *In re Pickard*, 681 F.3d 1201, 1206 (10th Cir. 2012) ("What else could be the purpose of a 60(b) motion? The movant is always seeking in the end to obtain § 2255 relief. The movant in a true Rule 60(b) motion is simply asserting that he did not get a fair shot in the

original § 2255 proceeding because its integrity was marred by a flaw that must be repaired in further proceedings").

The district court relied on *Edwards* in reaching its incorrect conclusion. But *Edwards* dealt with a Rule 60(b) motion alleging abandonment of counsel. This Court observed:

> [p]rocedural defects are narrowly construed. They include fraud on the habeas court, as well as erroneous previous rulings which precluded a merits determination—for example, a denial for such reasons as failure to exhaust, procedural default, or statute-of limitations bar. They generally do not include an attack based on the movant's own conduct, or his habeas counsel's omissions, which do not go to the integrity of the proceedings, but in effect ask for a second chance to have the merits determined favorably.

*Id.* at 205 (quoting *In re Coleman*, 768 F.3d 367, 371-72 (5th Cir. 2014)). Bernard's claim instead is that the habeas court was defrauded, which as *Coleman* noted, is exactly the type of claim properly brought under Rule 60(b).

*Edwards* did state broadly that "[Edwards's] Rule 60(b) motion seeks to re-open the proceedings for the purpose of adding new claims. This is the definition of a successive claim." *Id.* at 205-06. But, as pointed out by Judge Dennis, that broad statement can't possibly be correct:

> If *Edwards* is interpreted to mean that a Rule 60(b) motion is always improper if granting it would ultimately permit a party to pursue claims for relief under 28 U.S.C. § 2254 or § 2255, this interpretation is obviously incorrect: A Rule 60(b) motion for relief from judgment in the habeas context is *designed to reopen the proceedings* to allow a petitioner to have claims heard on the merits.

*Gamboa v. Davis*, 782 Fed.Appx. 297, 301-02 (5th Cir. 2019) (Dennis, J, specially concurring, emphasis in original).

In *Gamboa*, Judge Dennis also quoted the same passage from *Pickard* set forth above. *Pickard* supports Bernard's position that forever preventing him from litigating the instant *Brady* claim would unfairly reward the Government for its own misconduct. In *Pickard*, the court addressed dictum in a prior panel decision, which had stated that if a Rule 60(b) motion "includes (or necessarily implies) related fraud on the state court (or the federal district court that convicted and/or sentenced the movant in the case of a § 2255 motion), then the motion will ordinarily be considered a second or successive petition because any ruling would inextricably challenge the underlying conviction proceeding." *Pickard*, 681 F.3d at 1206 (quoting *Spitznas v. Boone*, 464 F.3d 1213, 1216 (10th Cir. 2006)). The *Pickard* court rightly rejected that view, explaining that it could not "accept the proposition that the government has a free pass to deceive a habeas court into denying discovery just because it similarly deceived the trial court." *Id.* at 1207.

*Pickard* elaborated that letting the Government's misconduct during the original § 2255 proceeding force the court thereafter to treat as "second or successive" any motion raising belatedly discovered "prosecutorial deceit" from trial would "compound a substantial injustice[.]" *Id.* Doing so would place defendants under a far higher burden than the Rule 60(b) standard, which would require only a

49

showing "that the false statement had improperly forestalled discovery in the § 2255 proceedings." *Id.* (And, as discussed in section V.B.2 *infra*, at least under Fifth Circuit precedent giving a literal reading to § 2255(h)(1), AEDPA's gatekeeping standard cannot be met where the Government violations affected "only" the death penalty.) The *Pickard* court concluded, "We doubt that the governing procedural rules permit the government to gain such an advantage by its own fraudulent conduct." *Id.*

Additionally, *Coleman*, on which *Edwards* relied, supports Bernard's position that his motion is properly brought under Rule 60(b). In *Coleman*, this Court foreclosed a successive IAC claim, but carefully distinguished that type of allegation from the kinds that Bernard alleges here:

> Coleman *does not allege that the* court or *prosecution prevented her from presenting such evidence*, but rather argues that her own counsel was ineffective in failing to present such evidence. The Supreme Court has held that such an argument sounds in substance, not procedure.

768 F.3d at 372 (footnote omitted).

In contrast, Bernard has alleged that a defect in the proceedings "prevented [him] from presenting [the relevant] evidence" in his initial § 2255 motion. Thus, under *Coleman*'s logic, the instant motion was properly brought under Rule 60(b). As a result, the district court had jurisdiction under that Rule to reopen the proceedings.

> **2.** ***If Bernard's motion were deemed successive and Rule 60(b) relief were deemed unavailable, then the restrictions in § 2255(h) would violate the Constitution's Suspension Clause as applied to him.***

If this Court concludes that Bernard's motion is successive, and also that it falls outside Rule 60(b)'s purview, then his claims can be heard only if he satisfies § 2255(h), which permits successive petitions only for:

> newly discovered evidence that, if proven and viewed in light of the evidence as a whole, would …establish by clear and convincing evidence that no reasonable factfinder would have found the movant guilty ….

28 U.S.C. § 2255(h)(1). Under this circuit's precedent, however, evidence relevant only to punishment cannot justify a successive petition, even if it would lead any reasonable factfinder to reject the death penalty. *See Webster*, 605 F.3d at 257. As interpreted in *Webster*, § 2255(h) would bar Bernard from ever raising his meritorious *Brady* claim in any judicial proceeding. By that reading, in the unique context of penalty-phase *Brady* violations, the Government would need only withhold favorable information through the pendency of an initial habeas proceeding to forever insulate that constitutional violation from habeas review. And if the one-year requirement for Rule 60(b)(1)-(3) motions is read as inflexible (*i.e.*, if a *Brady* violation cannot support a Rule 60(b)(6) motion, even when it is delayed due to the Government's continuing violation), then those violations become immune from *any*

judicial review, if the Government can only manage to hide the exculpatory information for one calendar year after a ruling on the initial § 2255.

Bernard maintains that the constitution itself forbids that unjust result, and that barring such claims would impermissibly suspend the writ. *See* U.S. Const., Art. I, Sec. 9, Cl. 2.

The *Scott* court supported the view that it would violate the Suspension Clause to interpret § 2255(h) as preventing a prisoner from ever raising a *Brady* claim under such circumstances. 890 F.3d at 1243. The *Scott* court was correct: the finality interests underlying AEDPA cannot be held to allow the Government itself, through its own conduct, to foreclose a prisoner from ever bringing a particular claim. Where the Government hides material evidence favorable to sentencing throughout a trial and then conceals the fact of that violation until an initial habeas proceeding concludes, it is necessary either to interpret "successive" consistent with *Scott*'s interpretation, interpret Rule 60(b) to give the district court authority to hear the matter, or else to hold that § 2255(h) (if interpreted to bar such a motion) violates the Suspension Clause, at least in this narrow context.

## VI.   CONCLUSION

This Court should hold that Bernard's second-in-time § 2255 motion was not "second or successive," or in the alternative that his pleading constituted a proper motion for relief under Rule 60(b). If it rules that review is unavailable by either

statute or rule, it should allow Bernard's claim to proceed because any other result would violate the Suspension Clause. The Court should reverse the district court's contrary judgment and remand for further proceedings.

DATED this 23rd day of December, 2019.

Respectfully submitted,

*s/ Robert C. Owen*
**ROBERT C. OWEN**
Counsel of Record for Petitioner
Law Office of Robert C. Owen, LLC
53 W. Jackson Blvd., Ste. 1056
Chicago, Illinois 60604
(512) 577-8329 voice
robowenlaw@gmail.com

*s/ John R. Carpenter*
**JOHN R. CARPENTER**
Assistant Federal Public Defender
Federal Public Defender for the
Western District of Washington
1331 Broadway, Suite 400
Tacoma, Washington 98402
253.593.6710 voice
john_carpenter@fd.org

**CERTIFICATE OF SERVICE**

I hereby certify that on December 23, 2019, I electronically filed the foregoing Opening Brief with the Clerk of the Court using the CM/ECF system which will send notification of filing to the parties associated with the case.

*s/ John R. Carpenter*
John R. Carpenter, Washington Bar No.: 23301
Asst. Federal Public Defender
Western District of Washington
1331 Broadway, Suite 400
Tacoma, WA 98402
Phone: (253) 593-6710 / Fax: (253) 593-6714
Email: john_carpenter@fd.org

# CERTIFICATE OF COMPLIANCE

Counsel certifies that:

1.  Exclusive of the portions exempted by 5th Cir. R. 32, this Opening Brief complies with Fed. R. App. P. 32, and contains 12,658 words, and 1,459 text lines.

2.  This Opening Brief is printed in a proportionally spaced, Times New Roman typeface using 14 point font in text and 13 point font in footnotes.

3.  Upon request, undersigned counsel will provide an electronic version of this brief and/or copy of the word/page printout to the Court.

4.  Undersigned counsel understands that a material misrepresentation in completing this certificate, or circumvention of the type-volume limits in 5th Cir. R. 32.2.7, may result in the Court's striking this petition and imposing sanctions against the person who signed it.

*s/ John R. Carpenter*
John R. Carpenter, Washington Bar No.: 23301
Asst. Federal Public Defender
Western District of Washington
1331 Broadway, Suite 400
Tacoma, WA 98402
Phone: (253) 593-6710 / Fax: (253) 593-6714
Email: john_carpenter@fd.org