No. 19-70021

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

BRANDON BERNARD,

Defendant-Appellant.

On appeal from the United States District Court
for the Western District of Texas at Waco
Crim. No. 6:99-CR-70-2, Civ. No. 6:04-CV-164

The Honorable Alan D. Albright,
United States District Judge

## DEFENDANT-APPELLANT'S REPLY BRIEF

Robert C. Owen
Law Office of Robert C. Owen, LLC
53 West Jackson Blvd., Suite 1056
Chicago, IL 60604
Phone: (512) 577-8329
Email: robowenlaw@gmail.com
Texas Bar No.: 15371950

John R. Carpenter
Asst. Federal Public Defender
1331 Broadway, Suite 400
Tacoma, Washington 98402
Phone: (253) 593-6710
Email: john_carpenter@fd.org
Washington Bar No.: 23301

Attorneys for Defendant-Appellant
Brandon Bernard

**SUPPLEMENTAL REQUEST FOR ORAL ARGUMENT**

Defendant-Appellant has leveled substantial allegations of misconduct against the United States. In response, the Government offers a series of unsupported and dubious claims and then opposes oral argument, where it might otherwise be required to explain itself. Given the serious nature of the allegations, the questionable quality of the Government's responses, and the District Court's description of Bernard's procedural arguments as "compelling," this Court should hear argument. This would be true even if this case involved an ordinary custodial sentence. The fact that the Government's misconduct resulted in a death verdict only elevates the need for oral argument.

i

**TABLE OF CONTENTS**

TABLE OF CONTENTS ............................................................................ ii

TABLE OF AUTHORITIES ...................................................................... iii

I.    SUMMARY OF ARGUMENT IN REPLY ..................................................... 1

II.   ARGUMENT IN REPLY ............................................................................ 6

    A.    Structure of Argument in Reply. ............................................ 6

    B.    In denying that it knowingly suppressed favorable evidence and insisting that the evidence was immaterial in any event, the Government misstates the facts. ........................................... 6

    C.    *Panetti v. Quarterman* should foreclose treating Bernard's motion as successive, and *Blackman v. Davis* should not stand in the way because the precedent that it deemed controlling never addressed the issue presented here. ....................................... 16

    D.    The Government's fraud requires that Bernard be allowed to proceed under Rule 60(b). ...................................................... 20

    E.    If Bernard is not allowed to proceed under either § 2255 or Rule 60(b), this Court should allow his motion to proceed out of constitutional necessity – since any other ruling would amount to an unconstitutional suspension of the Great Writ. ............................. 23

III.   CONCLUSION ............................................................................................ 23

CERTIFICATE OF SERVICE ............................................................................ 26

CERTIFICATE OF COMPLIANCE .................................................................. 27

**TABLE OF AUTHORITIES**

**Federal Cases**

*Bailey v. Rae*,
339 F.3d 1107 (9th Cir. 2003) ............................................................. 14

*Banks v. Dretke*,
540 U.S. 668 (2004) ................................................................. 15, 24

*Blackman v. Davis*,
909 F.3d 772 (5th Cir. 2018) ............................................... 3, 16, 17

*Boss v. Pierce*,
263 F.3d 734 (7th Cir. 2001) ............................................................. 14

*Brady v. Maryland*,
373 U.S. 83 (1963) ....................................................................passim

*Brown v. Muniz*,
889 F.3d 661 (9th Cir. 2018) ............................................................. 17

*Dist. Att'y's Office v. Osborne*,
557 U.S. 52 (2009) ............................................................................. 18

*Fierro v. Johnson,*
197 F.3d 147 (5th Cir. 1999) ............................................................22

*Giglio v. United States*,
405 U.S. 150 (1972) ........................................................................... 22

*In re Coleman*,
344 F.App'x 913 (5th Cir. 2009) ....................................................... 4

*In re Davila*,
888 F.3d 179 (5th Cir. 2018) ............................................................. 4

*Johnson v. Dretke*,
442 F.3d 901 (5th Cir. 2006) ............................................................. 4

*Julian v. Hanna*,
732 F.3d 842 (7th Cir. 2013) ............................................................. 18

*Kyles v. Whitely*,
514 U.S. 419 (1995) ........................................................................... 9

*Leal Garcia v. Quarterman*,
573 F.3d 214 (5th Cir. 2009) ................................................................. 4

*Magwood v. Patterson*,
561 U.S. 320 (2010) ............................................................................. 16

*McDonough v. Smith*,
139 S. Ct. 2149 (2019) ......................................................................... 18

*Napue v. Illinois*,
360 U.S. 264 (1959) ......................................................................... 3, 24

*Panetti v. Quarterman*,
551 U.S. 930 (2007) .....................................................................passim

*Rosales-Mireles v. United States*,
138 S. Ct. 1897 (2018) ......................................................................... 24

*Scott v. United States*,
890 F.2d 1239 (11th Cir. 2018) ............................................................ 16

*Skipper v. South Carolina*,
476 U.S. 1 (1986) ................................................................................. 14

*Steidl v. Fermon*,
494 F.3d 623 (7th Cir.2007) ................................................................. 19

*United States v. Lopez*,
577 F.3d 1053 (9th Cir. 2009) .............................................................. 16

*Whitlock v. Brueggemann*,
682 F.3d 567 (7th Cir. 2012) ............................................................... 19

*Young v. City of Chicago, No. 17 C 4803*,
2019 WL 6349892 (N.D. Ill. Nov. 27, 2019) ...................................... 20

**Federal Statutes**

28 U.S.C. § 2254 ............................................................................... 5, 21

28 U.S.C. § 2255 ........................................................................ *passim*

42 U.S.C. § 1983 .................................................................................. 18

**Rules**

5th Cir. R. 32 ................................................................................. 27

Fed. R. App. P. 32 ....................................................................... 27

Fed. R. Civ. P. 60 ...................................................................passim

**Other**

*Josh Bowers & Paul H. Robinson, Perceptions of Fairness and Justice: The
Shared Aims and Occasional Conflicts of Legitimacy and Moral Credibility*,
47 Wake Forest L. Rev. 211 (2012) ............................................. 25

U.S. Const., Art. I, Sec. 9, Cl. 2 .................................................. 23

# I. SUMMARY OF ARGUMENT IN REPLY

The United States secured a single death sentence against Brandon Bernard by suppressing favorable evidence – the opinion of a law enforcement expert – that contradicted its arguments for why that most extreme punishment was appropriate. The expert opinion at issue came from an extensively qualified law enforcement gang expert who identified Bernard as occupying the very lowest rung of a gang hierarchy – a position far below that of every other defendant involved in the murder that underlies Bernard's death sentence. The Government not only suppressed this information, but having done so encouraged the jury to premise its death verdict on theories that were directly contradicted by the expert opinion it had concealed.

The Government suppressed this opinion throughout the trial and the entire litigation of Bernard's original § 2255 petition. And it capitalized on its own wrongdoing by misleading the District Court into believing that no such *Brady* evidence existed, by falsely claiming to have disclosed everything pursuant to a purported "open file" policy. The District Court relied on the Government's representations when it terminated Bernard's original § 2255 proceeding without granting either discovery or a hearing.

The suppressed opinion came to light only when the very same Assistant United States Attorney who had prosecuted Bernard in 2000 used the long-suppressed expert opinion against co-defendant Tony Sparks at his resentencing in

2018. Nothing in the record suggests that this prosecutor or any other member of the DOJ *ever* disclosed this information to *any* member of Bernard's legal team, at trial or since. Bernard's post-conviction counsel independently discovered the suppressed evidence by scouring the *Sparks* resentencing record. The Government deployed this evidence in Sparks' resentencing because it strongly supported the Government's theory that Sparks was firmly enmeshed in gang culture, occupied a leadership position within the gang, and therefore was likely to remain a dangerous individual – basically, the same general arguments that it used to secure Bernard's death sentence.

The record clearly establishes that the Government as a whole – and very likely this prosecutor in particular – was in possession of this expert opinion during Bernard's trial. And nothing in the record – or in the Government's brief here – suggests that the Government ever disclosed this opinion to the defense. The Government of course did not seek to introduce the officer's expert opinion at Bernard's trial, since her findings would have undercut the case for a death verdict against Bernard. Because the Government hid this information, the defense couldn't use it either, and Bernard sits on death row as a result.

The Government lacks any valid defense to these *Brady* [1] and *Napue* [2] allegations. In contending that this favorable expert opinion was never suppressed, the Government either misstates the known facts or makes claims wholly unsupported by the record. Its fallback position that the evidence was immaterial anyway is contradicted by two undisputable facts: (1) Sparks' sentencing judge explicitly found that the expert opinion was credible and justified a harsher sentence for Sparks, and (2) the same federal prosecutor who concealed the evidence from Bernard's sentencing jury in 2000 vigorously contested the suggestion by Sparks' defense attorney that Sparks' position in the gang hierarchy was as low as Bernard's.

Bernard's position is that these *Brady/Napue* issues must be reviewable in a second-in-time 2255 position because they cannot be deemed successive under *Panetti v. Quarterman*, 551 U.S. 930 (2007). In making this argument, Bernard provided a detailed analysis of why the underpinnings of *Blackman v. Davis*, 909 F.3d 772 (5th Cir. 2018) – often cited as resolving the *Brady*/successor issue against the defense – should not be deemed controlling. The *Blackman* panel erroneously concluded that it was bound by precedent, when in fact the cited decisions never

---

[1] *Brady v. Maryland*, 373 U.S. 83 (1963).

[2] *Napue v. Illinois*, 360 U.S. 264 (1959).

ruled on the *Pannetti* issue because it was not presented to them.[3] The Government's response ignores this.

As an alternative to his *Panetti* argument, Bernard contends that the motion he made below is properly brought under Fed. R. Civ. P. 60(b)(6), given the broad equitable power that provision confers upon a district court. In short, the Government defrauded the District Court during Bernard's § 2255 proceeding when it asserted that it had maintained an "open file" discovery policy and had disclosed all exculpatory information to the defense. The facts now available, as set out in Bernard's motion to the District Court, demonstrate that the Government's past claims of full disclosure by virtue of an open file were false. ROA.1569. This deceit matters, because the District Court relied heavily on the Government's "open file" claim in denying Bernard's original § 2255 motion without any opportunity for fact development, such as discovery or a hearing. ROA.1741.

Remarkably, the Government first suggests that even if it *did* defraud the District Court, maybe that's okay – because the law doesn't clearly prohibit such

---

[3] The analysis is set forth at pages 36-39 of Bernard's Opening Brief. As detailed there, the petitioner in *In re Davila*, 888 F.3d 179 (5th Cir. 2018), unlike Bernard, never contended that the second or successive gateway did not apply, but instead argued that he met those requirements; the petitioner in *Leal Garcia v. Quarterman*, 573 F.3d 214 (5th Cir. 2009) did not address a *Brady* claim nor consider *Panetti*'s analysis; and the petitioners in *Johnson v. Dretke*, 442 F.3d 901 (5th Cir. 2006) and *In re Coleman*, 344 F.App'x 913 (5th Cir. 2009), as in *Davila*, never argued that they were exempt from the second or successive gateway requirements.

misconduct in a § 2255 proceeding, as opposed to a § 2254 proceeding. Beyond that, the Government brazenly denies that Bernard has shown any fraud, insisting that no evidence indicates the Government's trial counsel knew about the expert opinion in 2000, even though the prosecutor's own words at Sparks' resentencing all but conclusively demonstrate otherwise. Next, and inconsistently, it speculates that perhaps the Government's trial attorney knew about this evidence, but chose not to offer it due to some (imagined) vigorous motion practice initiated by the defense. And finally it suggests that any suppression that favored the Government is excused because maybe the Government's appellate attorneys were unaware of the fraud perpetuated by their predecessor counsel. To the extent these arguments rest on assertions of fact, they are not credible; to the extent they invoke legal principles, they distort and misapply them. The Government's response also ignores the cases cited in Bernard's opening brief showing that a Rule 60(b)(6) motion is properly brought under circumstances like these, even though, absent the Government's fraud, the motion could have been brought under other provisions of the rule.

Finally, Bernard contends that if controlling precedent does not allow his motion to proceed as a second-in-time but not successive § 2255 motion, or as one properly brought under Rule 60(b), the motion should nevertheless be allowed to proceed because any other outcome would unconstitutionally suspend the writ of habeas corpus. The Government dismissively suggests that Bernard's case is not

5

sufficiently compelling, suggesting that he seeks "limitless rounds" of review. He does not. Instead, Bernard seeks the one fair chance to be heard that the Constitution guarantees, and of which, thus far, the Government's fraud has deprived him.

## II. ARGUMENT IN REPLY

### A. Structure of Argument in Reply.

Bernard's opening brief unambiguously identified the improperly withheld evidence as the favorable expert opinion of gang specialist Sergeant Hunt. In response, the Government does not deny that it never disclosed Sergeant Hunt's opinion to any member of Bernard's defense team. To divert the Court from this key concession, the Government advances an array of demonstrably false claims related to the suppressed *Brady* evidence and its materiality, and urges the Court to fault Bernard for not having discovered the Government's misconduct sooner. Bernard will first correct the Government's misleading factual claims before responding to its legal arguments against allowing Bernard's motion to proceed.

### B. In denying that it knowingly suppressed favorable evidence and insisting that the evidence was immaterial in any event, the Government misstates the facts.

The Government admits that it never disclosed Sergeant Hunt as a witness, let alone the content of her favorable expert opinion. Response at 7. It contends, however, that it was excused from doing so because "Hunt was only tangentially involved in the original investigation." Response at 7. But the Government's attempt

to absolve itself of its *Brady* obligations by applying the label "tangential" rings hollow. No matter what her relationship to the overall investigation, Sgt. Hunt was involved in the investigation and her opinion was exculpatory; the Government was therefore duty bound to disclose it under *Brady*. But in truth, Sergeant Sandra Hunt was hardly "tangential" to the Government's investigation into the gang at the center of the Bagley murders. When reviewing Sergeant Hunt's expert qualifications during her testimony at Sparks' 2018 resentencing, the Government's counsel – the very same attorney who had prosecuted Bernard eighteen years earlier – outlined the great depth of experience that Sgt. Hunt had brought to the case. Sergeant Hunt started working in gang crimes within the Killeen Police Department in 1994. ROA 2315. She worked in its gang unit when that specialized team was formally created in 1999 and had risen to serve as its supervisor by the time it was dissolved in 2005. ROA 2315. She completed at least 700 hours of "specific gang-related training." ROA 2315. And her primary function throughout this time was to analyze gang writings to identify gang members, which the gang unit tracked and monitored using an elaborate database that encompassed multiple sources and criteria. ROA 2315-16. She was also Vice President of the Gang Investigators Association of Texas from 1994 to 2008. ROA.2314. Sgt. Hunt brought all this expertise to bear in consulting with the Government on Bernard's case in 1999, when she was asked to opine on

the hierarchical structure of the gang to which all the youths involved in the Bagley murders belonged. ROA.2321.

The Government's central argument for a death verdict was that Bernard's position within that gang all but guaranteed that he would grow into a violent predator even if confined in prison for the rest of his life. Indeed, the Government called BOP Intelligence Officer Anthony Davis to testify to just that. ROA.5730-31; Opening Brief at 18. But since Sgt. Hunt's opinion directly undercut its theory for death, the Government neither called her, nor disclosed her work or her opinions to the defense. Certainly, the Court can be confident that if Sgt. Hunt had told the Government that her assessment revealed Bernard to be one of the top-ranking members of the gang, the Government would have called her to testify alongside Officer Davis. The Government's characterization of Sgt. Hunt as "tangential" to the investigation thus is both legally irrelevant and factually baseless.

The Government confusingly declares that "there is no evidence that the trial prosecutor had any knowledge about the potential testimony of a tangentially-involved local gang prosecutor, rendered 18 years after the trial took place." Response at 22; *see also id.* at 25-26 (making similar claim). [4] But the trial

---

[4] The Government's focus on the trial prosecutors' "knowledge" about Hunt's "potential testimony" years later muddies the key question under *Brady*: did the Government know, or should it have known, of her exculpatory expert opinion in 1999? The Supreme Court has made clear that the Government cannot avoid its *Brady* obligations by sequestering away the exculpatory information with a law enforcement official who takes care not to

prosecutor's own words show that he was *in fact* aware of Sgt. Hunt's favorable expert opinion at the time of Bernard's trial.

The same federal prosecutor who prosecuted Bernard in 2000 handled Sparks' resentencing in 2018. His exchanges with Sgt. Hunt during that proceeding squarely document the fact that he had consulted with her in advance of the 2000 trial:

| | |
|---|---|
| AUSA: | …. You're familiar with the incident that took place on June 21st, 1999 in Killeen where Todd and Stacie Bagley were kidnapped and murdered? |
| Sgt. Hunt: | I am. |
| AUSA: | Did you *at that time, at our request*, go back to see if any of the identities of any of the other people who were involved in that were on this chart? |
| | …. |
| Sgt. Hunt: | I did. Brandon Bernard, also known as "Dip," is at the very bottom of the chart of pyramid, second name in, about 30 people below Mr. Sparks. [ROA.2321 (emphasis added)] |

Only by ignoring this exchange could one insist, as the Government does here, that there is "no evidence" that the trial prosecutor had contemporaneous knowledge of Hunt's expert opinion in 2000. Response at 22.

---

share the information with the prosecuting attorneys. *See, e.g., Kyles v. Whitely*, 514 U.S. 419, 437 (1995) (under *Brady*, "the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police").

Simply put, the transcript of Sparks' resentencing dynamites the Government's claim that the U.S. Attorney's office did not know of the suppressed expert opinions until years after Bernard's trial. *Cf.* Response 22, 25-26 *with* ROA.2321. But the record contains further evidence that circumstantially disproves the Government's claim as well.

The Killeen Police Department Gang Unit was dissolved in 2005; former Sergeant Hunt retired from the force in 2018 and now works as an investigator for a county attorney's office. ROA 2314-15. Thus, Sgt. Hunt did not continue to develop evidence about the hierarchy of the 212 PIRU Bloods from the time of the murders in 1999 right up until the time of Sparks' resentencing nearly twenty years later. Rather, she reviewed and formulated her opinions at the time of Bernard's trial and communicated them to the Government straightaway – at which point the Government promptly suppressed them. *See* ROA.2321. The *Sparks* resentencing transcript from 2018 likewise shows that the KPD's "translated" chart – which the Government does not even claim it ever provided to the defense – was created by the Gang Unit clerk shortly after Hunt came into possession of the non-translated chart in 1998 (it certainly could not have been produced much later, given the surrounding context that Hunt investigated the gang "for a number of years" and the Gang Unit was shut down in 2005). ROA.2319.

Even as the Government denies that it learned anything from Sgt. Hunt when it consulted with her on this case in 1999, it implausibly asserts that the Government was simply too beaten down at Bernard's trial to offer evidence of the gang's hierarchical structure, having been deterred by the defense's repeated objections to gang evidence. Response at 25 n. 5. Nothing in the record supports this contention (the Government offers no citation to support it), and indeed the record suggests the opposite: when co-defendant Vialva's counsel moved to limit gang evidence, the trial court flatly denied the motion. *See* ROA.4028-29. The suggestion that the defense's advocacy discouraged the Government from offering evidence about the structure of the gang is also contradicted by the Government's closing arguments at sentencing, which rested on the premise that Bernard deserved death because he posed a permanent threat of lethal violence due to his strong gang ties. *See, e.g.*, Defendant-Appellant's Opening Brief at 18 n.17. On this record, the only plausible inference is that the Government withheld any evidence of the gang hierarchy because it knew that doing so might lead to discrediting its future dangerousness claims against Bernard. *Id.* at 12-17.[5]

But the Government's reasons for not presenting Sgt. Hunt as a witness are irrelevant under *Brady*; the critical question is why it didn't disclose her exculpatory

---

[5] Intervening events have conclusively shown these dire predictions about Bernard to be false. ROA.2254, 2399-2412.

opinions to Bernard's counsel. Having repeatedly labeled the Government's preeminent gang expert as a mere bit player, the Government asserts that it was no under no legal obligation to disclose Sgt. Hunt's expert opinion. For support, the Government points to cases where *Brady* was found inapplicable because the purportedly exculpatory information was found to have been developed in an investigation unrelated to the prosecution of the defendant. Response at 26. These decisions are plainly inapposite here, where – as repeatedly noted – the record shows that Sgt. Hunt was actively working on Bernard's case in conjunction with the Government's trial team in advance of Bernard's trial. ROA.2314-21.

Recognizing that it is stuck with the fact that it never disclosed either Sergeant Hunt's expert opinion or the translated chart that her Gang Unit produced, the Government suggests that it did enough by listing the original student-drawn chart among its many potential exhibits. Response at 22, 25. For several reasons, this claim fails.

First, nothing in the record shows that the actual chart was disclosed – only that the Government included it as an item in a lengthy list of potential exhibits. The Government asserts that it must have actually disclosed the chart itself, though, and invites the Court that to conclude that it did, because the Government claimed to follow an "open file" policy by which it shared all exculpatory evidence. Response

12

at 22-23.[6] The obvious fallacy of this reasoning, as Bernard's motion makes clear, is that claiming to have an open file policy and actually having one are two different things. If a genuine, meaningful and fair "open file" policy had existed prior to trial, it would have resulted in the disclosure of Sergeant Hunt's expert opinion back in 1999. And we would know that had occurred, because any reasonable defense lawyer in possession of her opinion would have put it before the jury to show that, contrary to the Government's depiction, Bernard was a low-level, peripheral member of the gang. The fact that the Government in its brief never claims that it disclosed that opinion also speaks volumes.

---

[6] To support its claim, the Government points only to remarks made by co-defendant's counsel that indicated that he had been given "complete discovery" and had gone through "several hundred exhibits." ROA.2524; Response at 22. That lawyer, of course, did not represent and could not speak for Bernard. Moreover, that lawyer could not know if anything was missing from what he was allowed to see. There is no reference to when or where the supposed exhibit review took place or whether Bernard's counsel were present, and there is no specific reference to the gang diagrams in question. Thus, the page that the Government cites does not support its claim that it actually "provided" co-defendant's counsel with any exhibits that co-defendant's counsel reportedly reviewed, as opposed to merely allowing for their inspection at a Government office. Nor does the cited page at all document that either gang hierarchy chart was among these supposed exhibits purportedly made available for review. And the Court should keep in mind that the Government does not even claim to have disclosed the Gang Unit's 1999 "translated" chart to *any* member of *any* defense team until Sparks' 2018 resentencing. As noted by Bernard's post-conviction counsel, nothing in Bernard's trial counsel's file suggested that any gang hierarchy exhibit was ever provided to Bernard's trial team, let alone the expert opinion of Sgt. Hunt, which is the most critically important piece of *Brady* evidence in this case. ROA.2415-16.

Second, as noted in Bernard's Opening Brief,[7] even if the original hand-written chart itself had been disclosed, that would not have been sufficient to satisfy *Brady*, since the mitigating value of the suppressed expert opinion evidence was different from, and far greater than, any information that could have been gleaned from a high school student's arcane doodles on a page of notebook paper. The suppressed expert opinion evidence was both favorable *and* came from a law enforcement source – a source largely immune from impeachment by the Government. The courts have long recognized the value of such evidence. *See, e.g., Skipper v. South Carolina*, 476 U.S. 1, 7-8 (1986) (finding that jailers' testimony about defendant's good behavior in jail was not "merely cumulative" of similar testimony from family members because jurors would "quite naturally" give "much greater weight" to the testimony of "disinterested witnesses" like the jailers, who "would have had no particular reason to be favorably predisposed toward [the defendant]"); *Bailey v. Rae*, 339 F.3d 1107, 1116 (9th Cir. 2003) (noting the significant difference between testimony of a discredited teenaged witness and the suppressed clinical assessment provided by a disinterested professional therapist: "Cumulative evidence is one thing. Unique and relevant evidence offered by a disinterested expert is quite another"); *Boss v. Pierce*, 263 F.3d 734, 745 (7th Cir.

---

[7] Opening Brief at 13-14.

2001) (stating that "independent corroboration of the defense's theory of the case by a neutral and disinterested witness is not cumulative of testimony by interested witnesses, and can undermine confidence in a verdict."). The Government's response does not address this line of cases. On the contrary, it embraces the argument they explicitly reject – namely, that suppressed information can be disregarded as immaterial where the defense offered similar evidence through family witnesses who were then impeached as biased or uninformed. *See* Response at 26-29.

Finally, the Government attempts to deflect the blame to Bernard, saying that this is really all his fault because he should have discovered Sergeant Hunt's expert opinion on his own, despite the Government's ongoing assurances that it was disclosing everything. Response at 26. The Supreme Court rejected that very same proposition more than fifteen years ago: defense counsel cannot be forced to "scavenge for hints of undisclosed *Brady* material when the prosecution represents that all such material has been disclosed." *Banks v. Dretke*, 540 U.S. 668, 696 (2004); *see also id*. ("A rule thus declaring 'prosecutor may hide, defendant must seek,' is not tenable in a system constitutionally bound to accord defendants due

15

process."). Even with advance notice of this authority, the Government has no counterargument to offer.[8]

> **C. *Panetti v. Quarterman* should foreclose treating Bernard's motion as successive, and *Blackman v. Davis* should not stand in the way because the precedent that it deemed controlling never addressed the issue presented here.**

Bernard's position is that the logic of *Panetti v. Quarterman*, 551 U.S. 930 (2007) dictates that second-in-time petitions cannot be deemed successive if they advance *Brady* claims that could not have been advanced earlier due to the Government's unclean hands. The Government's response correctly notes that no Circuit has yet adopted this view.[9] Response at 15. The logic of Bernard's position remains sound, however, as panels from the Eleventh and Ninth Circuit have noted. *See Scott v. United States*, 890 F.2d 1239 (11th Cir. 2018); *United States v. Lopez*, 577 F.3d 1053 (9th Cir. 2009)[10]. Closer to home, the court below described this logic

---

[8] *See* Reply to Government's Response at 11, *United States v. Brandon Bernard*, Fifth Cir. Cause No. 19-50837.

[9] It should be noted, however, that Bernard's reading of *Panetti* is consistent with the reading the Supreme Court gave that decision three years later in *Magwood v. Patterson*, 561 U.S. 320 (2010). In *Magwood*, the Court repeated that an application is not "second or successive" if it contains a claim that the petitioner had no fair opportunity to raise in his initial habeas application. 561 U.S. at 343 (Breyer, J., concurring); *id.* at 335 n.11 (observing that the Court has held "three times" that a second-in-time habeas application need not necessarily be deemed "successive") (citations omitted).

[10] In *United States v. Lopez*, 577 F.3d 1053 (9th Cir. 2009), the Ninth Circuit avoided the difficult question presented here by ruling that an alleged *Brady* violation failed to meet

as "compelling." ROA.2426. Nevertheless, as Bernard noted in his Opening Brief, his motion does, at first blush, appear to be foreclosed by *Blackman v. Davis*, 909 F.3d 772 (5th Cir. 2018). But as detailed across three pages of his Opening Brief, *Blackman* offers shaky support at best for refusing to hear Bernard's prosecutorial misconduct claims, because the *Blackman* panel never analyzed the issue, erroneously believing it was bound by precedent, when in fact no panel had ever addressed the question presented here. *See* Opening Brief at 36-39. The Government offers no argument to rebut this analysis.

Additionally, the Government contends that *Panetti* supports the notion that a claim "ripens" whenever the constitutional violation occurs. Response at 14. In the Government's view, a *Brady* claim "ripens" when the initial prosecutorial misconduct is committed, regardless of when the defendant discovers it. *Id*. at 14-15. Thus, the Government insists, successfully concealing *Brady* material throughout the federal trial and collateral review process renders any *Brady* claim

---

the requisite materiality standard. In so doing, it explicitly left open the possibility of deeming a meritorious *Brady* claim reviewable:

> We decline to resolve the more difficult question whether federal courts have jurisdiction to consider a subset of meritorious Brady claims that federal courts would have considered on the merits under the pre-AEDPA abuse-of-the-writ doctrine but that would be barred under a literal reading of "second or successive" in § 2255(h)(1).

*Id.* at 1056. A different panel of the Ninth Circuit, however, has since foreclosed consideration of such claims in cases involving state prisoners. *Brown v. Muniz*, 889 F.3d 661, 673 (9th Cir. 2018), *cert. denied sub nom. Brown v. Hatton*, 139 S. Ct. 841 (2019).

unreviewable thereafter. *Id.* Simply put, the Government would fault the defendant as a matter of law for not bringing the claim sooner, even though its factual predicate could not previously have been discovered. *Id.* But as Bernard's opening brief points out, *Panetti* did not define "ripeness," and the legal definition of that term, as well as Fifth Circuit authority, supports the view that *Brady* claims do not ripen until discovered. Opening Brief at 34. The Government's response does not address these authorities either.[11]

In a related vein, the Government contends that Bernard's position is undercut by the fact that the Supreme Court has not extended *Brady* protections into the post-conviction realm, citing *Dist. Att'y's Office v. Osborne*, 557 U.S. 52 (2009), a § 1983 case that involved state post-conviction procedures. Response at 16. The first and most important point to be made about *Osborne* is that Bernard's claim for relief from his death sentence rests solely and exclusively on the constitutional violation committed by the Government *at trial* when it concealed the exculpatory expert opinion of Sgt. Hunt. To the extent Bernard has complained about the patent

---

[11] Additionally, it should be noted that other courts take a broader view than this Circuit concerning when a claim ripens. For example, Judge Posner has written that a *Brady* claim becomes ripe no earlier than when the exculpatory evidence is discovered. *See Julian v. Hanna*, 732 F.3d 842, 849 (7th Cir. 2013). *Cf. McDonough v. Smith*, 139 S. Ct. 2149, 2159 (2019) (holding that time to bring malicious-prosecution claim under 42 U.S.C. § 1983 based on fabricated evidence accrues not from earliest date plaintiff becomes aware of fabricated evidence, but from later date of favorable termination of proceedings against him).

unfairness of the Government's actions in continuing to suppress that evidence in the years since 2000, those arguments are directed solely to the equitable interest in finding a way for Bernard to obtain judicial review of that trial-level constitutional violation now. Nothing about Bernard's *trial*-level *Brady* challenge is affected in any way by *Osborne*'s discussion of state post-conviction remedies, and his entitlement to relief does not depend on extending *Brady* to post-conviction proceedings.

Further, the Government's interpretation of *Osborne* errs in many respects. First, *Osborne* held only that due process does not require a state to turn over evidence for DNA testing *to determine* whether the evidence is exculpatory (*i.e.*, *Osborne* is not about whether the Government has a duty to disclose manifestly exculpatory evidence, at whatever stage of the process). And its focus was not on federal collateral review but on when federal courts can "upset a State's postconviction relief procedures[.]" *Id.* at 69. Post-*Osborne* decisions confirm that *Osborne* left undisturbed the obligation of prosecutors to disclose, during post-conviction proceedings, exculpatory information that – as here –existed prior to conviction. *See Whitlock v. Brueggemann*, 682 F.3d 567, 588 (7th Cir. 2012) (rejecting the idea that "*Osborne* has worked a significant change in *Brady* doctrine" and reaffirming the holding in *Steidl v. Fermon,* 494 F.3d 623, 625 (7th Cir.2007), that "the *Brady* line of cases has clearly established a defendant's right to be informed

about exculpatory evidence throughout the proceedings, including appeals and authorized post-conviction procedures, when that exculpatory evidence was known to the state at the time of the original trial."), *abrogation on other grounds recognized in Young v. City of Chicago*, No. 17 C 4803, 2019 WL 6349892, at *6 (N.D. Ill. Nov. 27, 2019).

### D. The Government's fraud requires that Bernard be allowed to proceed under Rule 60(b).

As an alternative to construing his motion as a second-but-not-successive § 2255 motion, Bernard maintains that his motion below should be construed as properly brought under Rule 60(b)(6), specifically arguing that the rule gives district courts broad equitable authority under which the District Court could have considered Bernard's motion – even though it might be time-barred if brought under other subsections of the rule – because the opposing party's fraud prevented Bernard from bringing it earlier.[12] Opening Brief at 40-45. His Opening Brief analyzed several cases where courts reached that conclusion on similar facts. *Id.*

---

[12] According to the Government, Bernard "acknowledge[d]" in his opening brief that he cannot "shoehorn" his claims into an untimely motion under subsection (b)(6). Response at 24 n.4. That is not at all the Bernard's position, and the Government's failure to grasp that point is baffling. In fact, Bernard demonstrated, through citation of authority, that courts have recognized that, while out-of-time claims ordinarily cannot be brought via (b)(6), a more flexible approach may be required where applying the rule literally would risk extreme hardship or injustice. *See* Opening Brief at 40-41.

The Government's surprising response is to suggest that maybe its fraudulent actions are immune to correction because no decisional law clearly bars defrauding the court in a § 2255 proceeding, as opposed to a § 2254 proceeding. Response at 21 n. 3. To state this "argument" is to refute it. The Government's analysis does not improve much from there, as it argues next that "no evidence" shows that the trial prosecutor knew about Sergeant Hunt's expert opinion in 2000, even though *his own words* show that he did. *See* Section II.B at p. 9, *supra*, ROA.2321; *cf.* Response at 22.

The Government then suggests that no fraud can be proven because there is no evidence that the appellate attorneys involved in this case had personal knowledge that they were deceiving the District Court. Response at 23. This contention fails to appreciate the difference between a "party" and "an attorney representing that party." The party here is the United States. The record demonstrates that the United States came into possession of Sergeant Hunt's favorable expert opinion before Bernard's trial, and *a fortiori* has possessed it ever since, including throughout the original § 2255 collateral review process. ROA.2321. The Government effectively concedes that it never disclosed this opinion to the defense. Response (*passim*). In the words of one case cited by the Government in its response, the Assistant United States Attorneys who have participated at various junctures in this case represented "a solitary prosecution unit" – that of the United States

21

Government. *Fierro v. Johnson*, 197 F.3d 147, 155 (5th Cir. 1999) (cited in Response at 23). The fraud perpetrated by that prosecution unit justifies allowing this case to proceed under Rule 60(b)(6). Otherwise, any party who defrauded a district court could dodge a Rule 60(b) fraud claim merely by changing attorneys. That cannot be the law.[13] *Cf. Giglio v. United States*, 405 U.S. 150, 154 (1972) (*Brady* obligations inhere to the entire prosecutor's office, not just a single attorney).

The remainder of the Government's response on the Rule 60(b) question disputes that the circumstances of Bernard's case are "extraordinary" enough to justify reopening his initial § 2255 action Response at 11, 23-30. If securing a death sentence by fraudulent means – both at trial, by hiding favorable expert opinion from the defense, and for years afterward, by deceiving reviewing courts about having done so – does not amount to extraordinary circumstances, it is hard to see what would.[14]

---

[13] To be sure, an individual attorney directly responsible for misleading a district court might be personally sanctioned for doing so, but that is for bar disciplinary authorities to decide.

[14] To the extent the Government makes specific fact-based claims in this section of its response (*e.g.*, that it was enough to disclose the "untranslated" gang diagram as originally scribbled by a high-school student, that Sgt. Hunt was a "tangential" actor, that Bernard should have uncovered the suppressed opinion on his own, and that Sgt. Hunt's expert opinion wasn't material anyway), those contentions have all been addressed in Section II.B, *supra*.

**E. If Bernard is not allowed to proceed under either § 2255 or Rule 60(b), this Court should allow his motion to proceed out of constitutional necessity – since any other ruling would amount to an unconstitutional suspension of the Great Writ.**

Bernard has argued that if neither the habeas statutes nor the rules of civil procedure, properly construed, allow him to advance his motion, this Court must authorize the District Court to consider it in order to preserve the meaning of the Constitution's Suspension clause, as applied to him. Opening Brief at 51; U.S. Const., Art. I, Sec. 9, Cl. 2. The Government declares that no such action is warranted because Bernard remains free to "continue to raise new challenges in the future so long as he satisfies the statutory requirements for successive motions." Response at 32. That blithe response of course completely misses the point, since Bernard's argument is that those selfsame "statutory requirements," if interpreted and construed according to the Government's view, are precisely what threaten to subject him to an unconstitutional execution. If the prosecutorial arm of the Executive Branch – simply by continuing to conceal a *Brady* violation from trial through the completion of one round of collateral review – can foreclose the Judicial Branch from ever examining that violation, then the writ has in fact been unlawfully suspended.

## III.  CONCLUSION

Under *Panetti v. Quarterman*, Bernard's § 2255 motion, while admittedly second in time, is not "successive" because the factual predicate of his claims was

unavailable at the time of his initial § 2255 proceeding. On that theory, the District Court had the authority to review the merits of Bernard's *Brady* and *Napue* challenges. Moreover, despite the furious spin on display in the Government's response here, the existing record compels the conclusion that the Government did fraudulently mislead the District Court about its compliance with *Brady*, both at Bernard's trial and since. Accordingly, the District Court was empowered to let his motion proceed under Rule 60(b) as well. If the Court has any lingering doubt about that, it should remand for full factual development, with discovery, depositions of the Government's attorneys, and a hearing. The resulting sunlight might prove a useful disinfectant.

And if in the Court's view neither the habeas statues nor the civil rules afford Bernard a vehicle for obtaining review, it should find that the District Court nevertheless has jurisdiction over Bernard's motion for relief because any other result would violate the Suspension Clause. The status quo – under which the courthouse doors remain closed to Mr. Bernard even though he has made a powerful showing that his death sentence is tainted by the Government's suppression of favorable evidence in 2000, a concealment it has maintained throughout the initial habeas process – is "not tenable in a system constitutionally bound to accord defendants due process." *Banks*, 540 U.S. at 695. *Cf. Rosales-Mireles v. United States*, 138 S. Ct. 1897, 1908 (2018) (reversing this Court's refusal to find plain error

in the misapplication of Sentencing Guidelines provisions in an illegal reentry case, and observing that "the public legitimacy of our justice system relies on procedures that . . . provide for error correction") (quoting Josh Bowers & Paul H. Robinson, *Perceptions of Fairness and Justice: The Shared Aims and Occasional Conflicts of Legitimacy and Moral Credibility*, 47 WAKE FOREST L. REV. 211, 215-16 (2012)).

DATED this 11th day of March, 2020.

Respectfully submitted,

<table>
<tr><td><u>*s/ Robert C. Owen*</u></td><td><u>*s/ John R. Carpenter*</u></td></tr>
<tr><td>**ROBERT C. OWEN**</td><td>**JOHN R. CARPENTER**</td></tr>
<tr><td>Counsel of Record for Petitioner</td><td>Assistant Federal Public Defender</td></tr>
<tr><td>Law Office of Robert C. Owen, LLC</td><td>Federal Public Defender for the</td></tr>
<tr><td>53 W. Jackson Blvd., Ste. 1056</td><td>Western District of Washington</td></tr>
<tr><td>Chicago, Illinois 60604</td><td>1331 Broadway, Suite 400</td></tr>
<tr><td>(512) 577-8329 voice</td><td>Tacoma, Washington 98402</td></tr>
<tr><td>robowenlaw@gmail.com</td><td>253.593.6710 voice</td></tr>
<tr><td></td><td>john_carpenter@fd.org</td></tr>
</table>

**CERTIFICATE OF SERVICE**

I hereby certify that on March 11, 2020, I electronically filed the foregoing Reply Brief with the Clerk of the Court using the CM/ECF system which will send notification of filing to the parties associated with the case.

*s/ John R. Carpenter*
John R. Carpenter, Washington Bar No.: 23301
Asst. Federal Public Defender
Western District of Washington
1331 Broadway, Suite 400
Tacoma, WA 98402
Phone: (253) 593-6710 / Fax: (253) 593-6714
Email: john_carpenter@fd.org

# CERTIFICATE OF COMPLIANCE

Counsel certifies that:

1. Exclusive of the portions exempted by 5th Cir. R. 32, this Reply Brief complies with Fed. R. App. P. 32, and contains 6,022 words, and 510 text lines.

2. This Reply Brief is printed in a proportionally spaced, Times New Roman typeface using 14 point font in text and 13 point font in footnotes.

3. Upon request, undersigned counsel will provide an electronic version of this brief and/or copy of the word/page printout to the Court.

4. Undersigned counsel understands that a material misrepresentation in completing this certificate, or circumvention of the type-volume limits in 5th Cir. R. 32.2.7, may result in the Court's striking this petition and imposing sanctions against the person who signed it.

_s/ John R. Carpenter_
John R. Carpenter, Washington Bar No.: 23301
Asst. Federal Public Defender
Western District of Washington
1331 Broadway, Suite 400
Tacoma, WA 98402
Phone: (253) 593-6710 / Fax: (253) 593-6714
Email: john_carpenter@fd.org